**UNITED STATES**

v.

**CHESAPEAKE & OHIO RY. CO.**

**No. 6808.**

United States Court of Appeals, Fourth Circuit.

Argued June 16, 1954.

Decided Aug. 14, 1954.

Alan S. Rosenthal, Dept. of Justice, Washington, D. C. (Asst. Atty. Gen., Warren E. Burger, L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., and Melvin Richter, Dept. of Justice, Washington, D. C., on brief), for appellant.

Meade T. Spicer, Jr., Richmond, Va. (Walter Leake, Richmond, Va., on brief), for appellee.

Before PARKER, Chief Judge, and DOBIE, Circuit Judge, and TIMMERMAN, District Judge.

PARKER, Chief Judge.

This is an appeal from a judgment in the sum of $2,671.43 in favor of the Chesapeake and Ohio Railway Company in a suit against the United States under the Tucker Act, 28 U.S.C.A. § 1346, to recover the difference between the domestic freight rate and the export rate on certain shipments of automobile parts made from Pontiac, Michigan, to Newport News, Virginia, between December 10, 1941 and January 9, 1942. The shipments in question consisted of twenty-four car loads of chassis, seat cabs and bodies. They were shipped on government bills of lading which showed that they were intended for export to China by way of Rangoon, Burma. The shipments were made in good faith with the intention that they would be exported, releases for that purpose were properly obtained, and, but for the fall of Rangoon to the Japanese, they would

have been exported on one of the vessels comprising the pool which the government was using in the transportation of lend-lease commodities. They were allowed to remain in Newport News, however, until after the fall of Rangoon, when it became impossible to transport them to China by way of that port. The government thereupon had them shipped to storage centers in the United States; and there is no showing that they were exported or that any further effort was made to export them. The railroad company billed the government for the domestic tariff rate on the shipments, which was duly paid. Later, in the year 1945, the general accounting office exercised the statutory right, 49 U.S.C.A. § 66, to deduct from other amounts due the railroad by the government the difference between the domestic tariff rate and the export tariff rate, which was lower; and this action was instituted to recover the amount of this deduction.

The tariff rates filed by the railroad with the Interstate Commerce Commission provide a lower rate for export shipments than for domestic shipments, but only for export shipments which do not leave the possession of the carrier until delivered to the vessel which is to transport them or on which proof of exportation is given. Provision 23,030 of Central Freight Tariff No. 218–M, which is on file with the Interstate Commerce Commission and applies to the shipments in question is as follows:

"The rates named in this tariff, or as same may be amended, and designated as 'Export Rates' will apply only on traffic which does not leave the possession of the carrier, delivered by the Atlantic Port Terminal carriers direct to the steamer or steamer's dock upon arrival at the port or after storage or transit has been accorded by the port carrier at the port under tariffs which permit the application of export rates, and also on traffic delivered to the party entitled to receive it at the carriers' seaboard stations to which export rates apply, which traffic is

handled direct from carriers' stations to steamship docks and on which required proof of exportation is given".

The question in the case is whether the domestic rate or the export rate applies to the shipments in question. The District Judge held that the good faith intention of the government, at the time the shipments were started, was not a controlling factor; that the fact that there was in effect and on file with the Interstate Commerce Commission, a certain rate for the transportation for purely domestic shipments moving from Pontiac, Michigan, to Newport News, Virginia, and another rate for export shipments initially moving between those two points, "determined" the reasonableness of both rates; that the tariff requirement for actual proof of exportation for application of the export rate, was a reasonable safeguard "to insure that actual exportation is carried out," and that the shipments involved in this case did not ever acquire or reach export status. With respect to the lack of evidence of any effort to export the shipments, the judge said:

"* * * there is no showing here that the government made any effort to ship these pieces of equipment anywhere except to Rangoon, and, in fact, made no effort to ship them to Rangoon, so far as the record shows. It is not in evidence in this case, but I think the court can take judicial notice that at the time lend-lease material of nearly every conceivable description, from cod liver oil and orange juice to mining equipment and railroad rolling stock, were being shipped to forty-odd nations of the world. I think I can take judicial notice of that fact because of the record of another case in this court. And no effort was made here to ship this equipment anywhere abroad and it was simply sent into storage."

We think the trial judge was clearly correct in holding that the domestic rate and not the export rate was the

one here applicable. Unquestionably there was an intention to export the goods to China when the goods moved from Pontiac, Michigan; but it is equally clear that this intention was abandoned after the fall of Rangoon and that what began as a movement in foreign commerce was converted into one which ended in this country and to which the domestic rates applied. We do not mean to say that the export rates would not apply if there had been a frustration of the enterprise from matters beyond the control of the shipper, as would be the case if the goods had been destroyed or seized by the public enemy before exportation. Here, however, the government was exporting goods of the sort involved to countries all over the world, and the fall of Rangoon did not prevent exportation to countries other than China. When the government voluntarily converted what had started out as an export shipment into a domestic shipment, there is no reason why it should not pay the domestic rate.

■ The government relies upon decisions of the Interstate Commerce Commission, of which C. B. Fox Co. v. Gulf, Mobile and Ohio R. Co., 246 I.C.C. 561 and Products-From-Sweden, Inc. v. Lehigh Valley R. Co., 263 I.C.C. 760, are typical, holding in reparation proceedings that the domestic rate should be held unreasonable and the export rate applied where because of conditions over which the shipper has no control the attempt to export the goods was frustrated. In those cases, however, it appeared that the shipper's ability to export the commodities was completely ended[1] by causes over which it had no control, not, as here, that the shipper abandoned the intention to export because one export channel was closed, when others were open, and thus voluntarily converted a movement which had begun as one for the export of goods to one in domestic commerce. Furthermore, while the Interstate Commerce Commission may pass upon the reasonableness of rates, the courts may not do so, but must apply the rates which the Commission has approved. Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Baldwin v. Scott County Milling Co., 307 U.S. 478, 481, 59 S.Ct. 943, 83 L.Ed. 1409. The question here, as in the court below, is not the reasonableness of the rates, but which rate is applicable to the shipment.

■ The government contends that the court below should have stayed the proceedings and referred the case to the Interstate Commerce Commission for an adjudication of the reasonableness of the domestic rate as applied to these shipments under the circumstances here appearing. It is a sufficient answer to this that no such action was asked of the court below but that, on the contrary, the stipulation of counsel on which the case was heard provided for judgment in accordance with a finding by the court as to whether proof of actual exportation was or was not required as a condition to the applicability of the export rate. "The rule is well settled that only in exceptional cases will questions, of whatever nature, not raised and properly preserved for review in the trial court, be noticed on appeal." Hutchinson v. Fidelity Inv. Ass'n, 4 Cir., 106 F. 2d 431, 436; Blair v. Oesterlein Machine Co., 275 U.S. 220, 225, 48 S.Ct. 87, 72 L.Ed. 249; 3 Am.Jur., p. 25 et seq. The contention is without merit in any event. Whether the District Court would have stayed proceedings to the end that the question of reasonableness of rates might be passed upon by the Commission would have been a matter resting in its sound discretion and no court would reasonably have exercised the discretion when both parties were barred by limitations from asking the Commission for relief. Furthermore, if the matter could be brought before the Commission, there is no ground for thinking that the Com-

---

1. In the Products-From-Sweden case the goods were eventually exported.

mission would have held the domestic rate unreasonable and the export rate reasonable when the government could have exported the commodities to countries other than China and, instead of doing so, voluntarily converted an export into a domestic shipment.[2]

Affirmed.

2. See Hanlon-Buchanan v. Burlington Rock Island R. Co., 258 I.C.C. 519, affirmed 263 I.C.C. 603; California Texas Oil Co. v. Bessemer & Lake Erie R. Co., 264 I.C.C. 147; Pacific Chemical & Fertilizer Co. v. Penn. R. Co., 268 I.C.C. 468; and American Republics Corp. v. Wichita Falls & S. R. Co., 259 I.C.C. 605.