Michael J. MORRISSEY, Appellant,

v.

WILLIAM MORROW & CO., INC.,
Bantam Books, Appellees.

No. 82–1213.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1983.

Decided July 26, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 25, 1984.

W. Jeffrey Edwards, Richmond, Va. (D. Alan Rudlin, Hunton & Williams, Richmond, Va., Michael J. Morrissey, Washington, D.C., on brief), for appellant.

Bruce W. Sanford, Washington, D.C. (Brian S. Harvey, Baker & Hostetler, Washington, D.C., on brief), for appellees.

Before HALL, · MURNAGHAN and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

Michael J. Morrissey, a practicing attorney, brought this action against William Morrow and Company, Inc. and Bantam Books, Inc., publishers of the book *Spooks: The Haunting of America—The Private Use of Secret Agents* alleging claims of defamation, invasion of privacy and injurious falsehood. Federal jurisdiction is alleged under 28 U.S.C. § 1332(a)—diversity jurisdiction. The district court granted defendants' motion for summary judgment finding the action barred by the one year statute of limitations, Va.Code 8.01–248. Plaintiff appeals alleging error of the district judge in (1) refusing to allow additional time for discovery after defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b) had been converted to a motion for summary judgment under Federal Rule of Civil Procedure 56; (2) "ruling on the record then established" that the statute of limitation began to run when the book was generally available to the public; and (3) failing to consider the possible conflict of law problem presented by the plaintiff's claim of invasion of privacy.

Finding no merit in these exceptions, we affirm.

I

The complaint alleges that Morrissey is an attorney and electrical engineer and that William Morrow published the hardback edition of *Spooks* and Bantam Books published the paperback edition of the same book. The complaint further alleges that publishing of the "false allegations, malicious statements and innuendo and implications assigning this material in the books has been humiliating and embarrassing to the plaintiff, caused him mental distress and has harmed him in his personal and business relationships and has the potential of causing further harm to him particularly in his profession as a lawyer." Plaintiff also alleges that he is an attorney admitted to the Bars of Virginia, the District of Columbia and various federal courts including the United States District Court for the Eastern District of Virginia.

His first action against the present defendants was filed in the United States District Court for the Eastern District of Virginia on December 1, 1980 with the plaintiff appearing pro se. On May 21, 1981 defendants filed a motion for summary judgment upon the ground that the Virginia one year statute of limitations applied to the action and that William Morrow's publication of *Spooks* occurred in August of 1978 and Bantam Books publication occurred not later than November 20, 1979 and the one year statute of limitations had run before the complaint was filed on December 1, 1980. This motion was accompanied by an affidavit of James D. Landis, vice president and editorial director of Wil-

liam Morrow and an affidavit of Heather Grant Florence, the vice president, secretary and general counsel of Bantam Books. Each affidavit set forth the date that the book was available for sale to the public. The plaintiff filed nothing in response to the motion for summary judgment. The motion was set for hearing on May 29, 1981, but on May 28, 1981, an attorney entered an appearance for Morrissey and obtained a continuance of the hearing on the summary judgment motion until June 5, 1981. A pretrial order had been entered by the district judge on April 1, 1981, establishing a discovery cut off date of June 12, 1981.

At the June 5, 1981 hearing plaintiff's attorney argued that additional discovery was needed as to the statute of limitations issue and the district court granted this motion and again continued the hearing for summary judgment. Depositions were scheduled with plaintiff's scheduled for June 9, 1981. On that date plaintiff voluntarily dismissed the action without having conducted any discovery.

On November 19, 1981, plaintiff filed the present action, again proceeding pro se, against the same defendants and alleging the same causes of action. On January 7, 1982 defendants filed a motion to dismiss the new action on the ground that it was barred by the statute of limitations. In support of this motion defendants filed affidavits seeking to establish the dates of publication and submitted the same supporting memorandum of law as used in the May 1981 motion. The hearing on this motion was set for January 22, 1982, but at Morrissey's request the hearing was continued until February 12, 1982. Morrissey did not notice or obtain any discovery in connection with the second action, although he was aware of the grounds for the defendant's motion and the supporting affidavits. In his opposition to the motion he pointed out that since it was supported by affidavits it must be tested by the standards of Rule 56. At the hearing on February 12, 1982 the plaintiff arrived late and argued against the motion and asked for additional time for discovery. He admitted that he had filed no interrogatories in either the first action or the second action, but stated that he had telephoned one of the defendants asking for date of publication information and seemed surprised that this telephone request was denied. He asserted that he had written a letter to the defendants' attorneys in June 1981 asking certain questions, but admitted that these were not in the form of interrogatories under the Federal Rules.

The district court found that the plaintiff had over six months to conduct discovery in the first action and three months to conduct discovery in the second action, but he had done nothing to create a factual dispute and had submitted nothing in opposition to the defendants' affidavits, although he had known since May 21, 1981 the defendants' position as to the statute of limitations and the content of the defendants' affidavits as to publication dates.

The district court observed that while the Virginia Supreme Court had not decided whether to adopt the "first-publication rule," the district court would adopt such a rule, but "giving the plaintiff the benefit of treating the paperback edition as perhaps reaching a different audience so that for publication purposes, the paperback publication would be the date of accrual of the cause of action. But I find that it accrued at the latest on November 20, 1979."

The affidavit of James D. Landis, vice president and editorial director of William Morrow stated in pertinent part:

4. That William Morrow began shipping its publication of the book *Spooks* to its customers—including retail bookstores— on August 1, 1978. Shipments of *Spooks* were completed by August 4, 1978 and the book was generally available and sold to the public on or before that date.

The affidavit of Heather Grant Florence, vice president, secretary and general counsel of Bantam Books, stated in pertinent part:

4. That Bantam Books began shipping the book SPOOKS from its DesPlains, Illinois warehouse on November 9, 1979,

and that the book was generally available for sale to the public in bookstores throughout the United States on or before November 20, 1979.

These affidavits accompanied the motion to dismiss filed in the present action on January 7, 1982.

Finding that the plaintiff had done nothing to establish a factual dispute as to the date of accrual of the cause of action, the court granted summary judgment because the action had not been brought within one year as required by Va.Code 8.01–248.

## II

The main thrust of plaintiff's brief and oral argument is that he was not given a reasonable time as provided by Federal Rule of Civil Procedure 12(b) to respond to the defendant's affidavit when the Rule 12 motion was converted to a Rule 56 motion. The last sentence of Rule 12(b) provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The first sentence of Rule 56(c) provides: "The motion shall be served at least 10 days before the time fixed for the hearing."

The last two sentences of Rule 56(e) state:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Morrissey concedes that this is a matter committed to the discretion of the district judge, but argues that it was an abuse of discretion to not allow him additional time for discovery to counter the statements in the defendants' affidavits and to explore any facts omitted from the affidavits.

The facts do not support this claim of abuse of discretion. It is abundantly clear that plaintiff engaged in no discovery in either his first suit or in the present action. In the original action the motion was set for a hearing on May 29, 1981, and on the day preceding such hearing, the court granted a continuance until June 5, 1981. On that date the court again granted a motion to continue the hearing and allowed plaintiff additional time for discovery, which was not used by the plaintiff, who took a voluntary dismissal on June 9, 1981.

It can be assumed that between June 9, 1981 and the refiling of the case on November 19, 1981, the plaintiff must have given some thought to his lawsuit and how he would respond to the Landis and Florence affidavits. As the trial judge explained to the plaintiff, he could have filed interrogatories immediately upon commencement of the second action. Rule 33(a). But again, nothing was done by the plaintiff.

He argues that during June 1981 he called the offices of one of the defendants to ask for certain information over the telephone. He claimed that he was surprised when defendants' employees did not furnish this information to him by telephone. It is inconceivable that any attorney, admitted to practice in the courts of Virginia and the District of Columbia, as well as the United States District Courts, would expect to obtain or use information from such a telephone conversation with an adversary.

Morrissey does not claim that he was taken by surprise by the motion to dismiss nor the fact that it was treated as a Rule 56 motion. He filed a 21 page "Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss" in which he discussed Rule 56, but he presented nothing to create an issue of fact.

Plaintiff does not claim that he did not know or believe that he would be required to file counter-affidavits. Nor does he claim that he was denied the opportunity to proceed with the discovery or that he was denied continuances requested from the court. He primarily asserts that he should have been given more time and that the time provided was not reasonable.[1]

Morrissey's reliance on *Johnson v. RAC Corporation*, 491 F.2d 510 (4th Cir.1974) is misplaced. In that case the court found that prejudice had resulted from the unexpected treatment of a motion under Rule 12(b)(6) as a summary judgment motion and the plaintiff had not had a "reasonable opportunity" to file material in opposition to a Rule 56 motion. In *Johnson* the plaintiff had filed extensive interrogatories which sought to counter the defendant's affidavit, but no discovery was permitted until the motion to dismiss was heard. Thereby the plaintiff was prevented from exercising his rights to discovery which could have produced an issue of fact. By contrast, Morrissey simply did not use the discovery procedures available to him in either the first suit or the present suit, although he was well aware of the defendants' position as to the statute of limitations and the content of the supporting affidavits. Morrissey, an attorney, knowingly and willfully did not avail himself of the opportunities for discovery, and we cannot say that the district court was in error in finding that he had a reasonable time in which to present affidavits or other materials in opposition to defendants' motion.

In *Clarke v. Volpe*, 481 F.2d 634 (4th Cir.1973), this court affirmed the district court's dismissal of the complaint under Rule 12(b)(6) where the defendants submitted affidavits and moved for judgment on the pleadings or, in the alternative, for summary judgment. This court stated:

> The appellate court is not bound by the label that the district court places upon its disposition of the case. Whenever outside matters are presented to and not excluded by the trial court, the motion should be considered on appeal as one for summary judgment even though the trial court characterized its action as a dismissal of the case for failure of the plaintiffs to state a claim upon which relief can be granted. The record reveals that *both* parties were given a reasonable opportunity to present affidavits and other evidence upon which the trial court could properly determine whether summary judgment should be entered. Only the defendants availed themselves of such opportunity. When such circumstances appear from the record the appellate court, for the sake of judicial economy, should make an immediate determination of the issue rather than remand the case to the trial court for disposition.

481 F.2d at 635–636.

Failure of a litigant to file counter-affidavits may be treated as a conscious waiver. See *Hummer v. Dalton*, 657 F.2d 621, 626 (4th Cir.1981), which involved a prisoner proceeding pro se. Morrissey is an attorney knowledgeable in the rules of procedure, who took the time to prepare a lengthy memorandum of law in opposition to the defendants' summary judgment motion. His failure to conduct any discovery or submit any opposing affidavits in either of his cases, given the time available and the continuances granted, can only be viewed as a waiver of such rights.

"Time and tide wait on no man," and the district court waited long enough for the present plaintiff.

### III

Appellant's second point is that based upon the record then before it, the district court erred in finding that the statute of limitations began to run when the books became "generally available" to the public. A large part of this argument is little more than a further complaint that the trial judge did not allow the plaintiff additional

---

1. Rule 56 does not provide limited time to a party opposing a motion. It requires at least 10 days notice by the movant, but states: "The adverse party prior to the day of hearing may serve opposing affidavits." Rule 56(c).

time to "test" the defendants' affidavits. Enough has been said on this point.

The Virginia Supreme Court has consistently applied the one year statute of limitation in Va.Code 8.01–248 to defamation actions. *Weaver v. Beneficial Finance Co.*, 199 Va. 196, 98 S.E.2d 687 (1957); *Watt v. McKelvie*, 219 Va. 645, 248 S.E.2d 826 (1978).

■ The district court said that it was adopting the single publication rule even though the Virginia Supreme Court had not yet faced the issue. The district court was justified in making this assumption. "The great majority of the States now follow the single publication rule." *Keeton v. Hustler Magazine, Inc.*, —— U.S. ——, —— n. 8, 104 S.Ct. 1473, 1480 n. 8, 79 L.Ed.2d 790 (1984).

This rule is summarized in Restatement (Second) of Torts § 577A(4) (1977):

As to any single publication, (a) only one action for damages can be maintained; (b) all damages suffered in all jurisdictions can be recovered in the one action; and (c) a judgment for or against the plaintiff upon the merits of an action for damages bars any other action for damages between the same parties in all jurisdictions.

■ Since William Morrow published the hardback edition of *Spooks* and Bantam Books more than a year later published the paperback edition, the district court addressed its attention to the latest date of publication. There is no claim that William Morrow and Bantam Books are affiliated companies and plaintiff does not argue that the act of one is the responsibility of the other. It is alleged that Bantam Books entered into a separate agreement with William Morrow to publish the book in paperback version and thereby Bantam Books restated the malicious falsehoods about the plaintiff. This is not a claim of republication by William Morrow, and it is obvious that from the record before the district court the hardback publication was shipped to bookstores and sold in August 1978, more than two years before plaintiff's action was brought. The Landis affidavit states that the hardback edition "was generally available and sold to the public on or before that date." (August 4, 1978). With nothing from the plaintiff to challenge this sworn statement as to the date of sale of the hardback book, there was no dispute as to a material fact and William Morrow was entitled to judgment as a matter of law.

■ The date of publication for the Bantam Books paperback edition involved a slightly different question.[2] Neither the paperback nor the hardback editions are in the record, but plaintiff's brief states as to the paperback edition "The book itself contains the publication date of December 16, 1979." Argument of counsel is not evidence and although defendants' acknowledge an "official publication date of December 19, 1979 printed in the paperback book", it is common knowledge that publications are often in the hands of the public before the date appearing thereon. This is particularly true of magazines. The May issue of a monthly magazine usually arrives on the newsstands and at the homes of subscribers by mid-April. Courts have recognized this as common practice. *Hartmann v. Time, Inc.*, 166 F.2d 127 (3rd Cir.1947); *McGlue v. Weekly Publications, Inc.*, 63 F.Supp. 744 (D.Mass.1946); *Khaury v. Playboy Publications, Inc.*, 430 F.Supp. 1342 (S.D.N.Y.1977).

■ The use of arbitrary "official publication dates" has been recognized as to books and found not to be determinative of the date of publication. In *Fleury v. Harper and Row Publishers, Inc.*, 698 F.2d 1022 (9th Cir.1983), cert. denied —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) the court held that the official publication date listed inside the cover of the book is immaterial in determining when the statute of limitations begins to run, stating:

The precedents with almost complete uniformity hold that publication occurs at

**2.** The district court gave plaintiff the benefit of considering the paperback edition as a separate publication for purposes of the statute of limitations.

the time of actual communication of the libel, not the date on the cover of the newspaper, magazine or other printed matter.

698 F.2d at 1028.

■ Appellant argues that under *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 81 N.E.2d 45, 49 (1948) a test for determining when the statute of limitations begins to run is "when the finished product is released by the publisher for sale in accord with trade practice." Appellant submits that "trade practice" should have been developed by the district court before granting summary judgment. The record before the district court contained the unchallenged affidavit that the paperback edition was shipped from the warehouse beginning November 9, 1979, and "that the book was generally available for sale to the public in bookstores throughout the United States on or before November 20, 1979." There was no reason to develop a record on "trade practice" when there was no challenge to the sworn statement that the books were available to the public in bookstores throughout the United States on or before November 20, 1979.

■ Morrissey submits that there were "a whole host of questions" to be resolved by the district court before deciding the statute of limitations issue. However, the district court was confronted with the single issue of the date of publication and properly resolved this issue based upon the unchallenged sworn statement that this date was not later than November 20, 1979.

## ·IV

■ Plaintiff's last claim is that the trial court erred in failing to consider the possible conflict of law situation presented in his claim for invasion of privacy. He argues that the common law right of invasion of privacy is recognized in the District of Columbia and since he had contacts in the District of Columbia this cause of action should have been recognized.

Virginia has rejected the "most significant relationship" test and applies the substantive law of the place of the wrong. *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979). Plaintiff resides in Virginia, practices law in Virginia, alleges he suffered damages in Virginia and brought his two actions in the United States District Court for the Eastern District of Virginia. There was no reason to consider a conflicts problem, and even if one had been considered, plaintiff's "most significant contacts" were in Virginia.

Under the present facts to allow the plaintiff one more chance to create a factual issue and avoid summary judgment would do violence to Rule 56 and the other Federal Rules of Civil Procedure.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

My dissent is not addressed to the bulk of the majority opinion. I too am completely of the view that the plaintiff's complaints about inadequacy of opportunity on his part to conduct discovery were ill-founded. On the contrary, he was afforded ample time to develop the facts, but he represented himself poorly and demonstrated why the legal profession as a whole takes a very dim view of the prudence or likelihood of success when a lawyer undertakes to plead his own case.[1]

My disagreement with the majority lies rather in the conclusions of law to be reached even assuming that everything asserted *factually* by the defendants was properly taken as proven, the plaintiff having offered no material to contradict the affidavits of the defendants or to develop facts other than those brought forward by the defendants. Impatience with a lawyer's inadequate performance should not blind our minds to the evident proposition that the factual posture of the case, even when taken fully from the defendants'

---

1. Also, for reasons not quite in accord with those expressed in the majority opinion, I concur in the decision that summary judgment in

defendants' favor should be affirmed on the plaintiff's claim of invasion of privacy.

point of view, does not afford a legal justification for denying the plaintiff a trial.

My major point of departure from the majority centers around the provisions in the affidavits filed by the defendants relating to the crucial subject of extent of distribution. In the case of the hardback edition produced by William Morrow & Co., Inc., the affidavit established that copies of the book were "generally available *and sold*" (emphasis supplied) on or before August 4, 1978, more than a year (indeed, more than two years) before suit was filed. The hardback edition consequently was manifestly published outside the time fixed in the applicable statute of limitations, namely, a period of one year. Va.Code 8.01–248 (1977 Repl.Vol.) fixes one year for causes of action for which no other limitation fixed by statute is provided. Included in that category are not only defamation but invasion of privacy and injurious falsehood as well.

In striking contrast, however, the paperback edition was only asserted in the executed affidavit to have been "generally available for sale" on or before November 20, 1979 (one year and eleven days before suit was filed).

The history of that substantially different affidavit merits some attention. An unexecuted and undated affidavit included in the file parrotted the language of the William Morrow affidavit and stated that the paperback edition of the book had been sold on or before November 20, 1979. However, being unexecuted, the document was a nullity. Moreover, another, substitute affidavit, fully executed by an executive officer of Bantam Books, dated May 27, 1981, merely stated that the book was "generally available for sale" on or before November 20, 1979. There is literally nothing to establish that a sale ever took place, before December 1, 1979, or, indeed, that any other occurrence constituting publication, such as free distribution to a critic, occurred. A book though printed is not published simply because it is "available." Evidence that it has been read by some member of the public is required. As the Court in *Hartmann v. Time, Inc.*, 166 F.2d 127, 132, 135 (3d Cir.1947), was careful to point out: "The ... Legislature of Pennsylvania can scarcely have intended the mere printing of a libel, without the publishing of it, to start the limitation period running." It went on to announce that "we cannot doubt but that the magazine was read by persons not privileged in Illinois prior to January 17, 1944."

To me, on summary judgment, where conflicting inferences as well as statements of fact are to be construed against the party seeking summary judgment, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co.*, 381 F.2d 245, 249 (4th Cir.1967), the record, as it now stands, would support a jury finding that no single copy of the paperback version of the book had been sold or, indeed, otherwise distributed so as to reach a member of the public. Indeed, it is hard to read the deliberate change in the contents of the affidavit to delete any reference to a sale of the books as other than an acknowledgment that the provider of the affidavit was unaware of the sale of any book, certainly at least, any sale more than a year prior to the filing of suit.

It is a simple proposition, indeed, that *publication* is what commences accrual of an action for defamation and associated torts, *Fleury v. Harper & Row Publishers, Inc.*, 698 F.2d 1022, 1027 (9th Cir.1983), *citing* Restatement (Second) of Torts, §§ 558, 577 (1977), and publication simply has not been made out insofar as the paperback edition is concerned.

Counsel for the defendants were candid with the Court in frankly acknowledging that the single publication rule[2] does not extend its scope so far as to have publication for a first edition also count as publica-

---

2. I am in complete accord with the majority's holding that Virginia, when occasion arises, will adopt the single publication rule. My differences stem from perceptions of what the single publication rule is exactly, and when and how it is to be applied.

tion for a separate, second edition. Counsel for defendants also conceded that the paperback version of *Spooks* was not merely a reprinting of the first edition, but rather a veritable second edition.[3]

For those reasons, the conclusion to which I come is at odds with that of my respected panel colleagues. It remains to set out in some detail why that is so.

At early common law, of course, before the advent of widespread reproduction and frequent publication taking place over large areas, each copy of an item appearing more than once was considered to be a separate publication, with each starting the statute of limitations running all over again. *See Duke of Brunswick v. Harmer*, 14 Q.B. 185 [1849], 117 Eng.Rep. 75; Note, *The Single Publication Rule in Libel: A Fiction Misapplied*, 62 Harv.L.Rev. 1041 (1949):

> Traditionally, libel consists in the unprivileged communication of defamatory matter to a person other than the defamed; each such communication constitutes a

publication, and each publication gives rise to a separate cause of action. Thus it is said that a new cause of action accrues on the sale of each copy of a defamatory book, newspaper, or magazine.[4]

The defendants, however, rightfully in the view of the members of the majority and of myself, assert that the single publication rule, developed in the relatively recent past, has supplanted for widely distributed books, magazine and newspapers the older view of the common law. Still in a state of evolution,[5] and neither definitively accepted nor rejected in Virginia, the single publication rule operates to modify the early common law and to protect the promulgation in large multiples of the same book, magazine, or newspaper from exposure to a separate, distinct and independent lawsuit based on every one of the identical items.[6] The district judge adopted, but, in my understanding of the law, misapplied the single publication rule.[7]

That conclusion would not, however, were summary judgment held to have been erroneously granted, preclude in any way renewal by William Morrow of its motion with adequate supporting affidavits or other substantiating materials demonstrating that it was in no way responsible for the paperback edition.

**3.** By itself, admittedly, the first, hardback edition is not actionable because of the lapse of more than one year since publication. While, in abstract theory, it might be argued that the William Morrow affidavit is ambiguous as to how many copies had been sold in the period more than a year before December 1, 1980, and, therefore, the volume of sale was insufficient to invoke application of the single publication rule, plaintiff's inadequate representation of himself cannot be excused of all its consequences. More than two years elapsed from August 4, 1978 before suit was brought. The publishers deemed a second edition warranted. The reed is simply too thin to keep the case alive on that theory of insufficient publication to invoke the single publication rule, bearing in mind that the plaintiff has done absolutely nothing to show that sales between August 4, 1978 and December 1, 1980 were trivial to the point of rendering application of the single publication rule inappropriate.

Nevertheless, bearing in mind that the case is at the relatively early stage of a motion for summary judgment, where the facts presented were altogether silent, one way or the other, with respect to possible interconnection between William Morrow and Bantam Books and the interrelationships between the two publications, one of the hardback edition, the other of the paperback edition, it is inappropriate, as I view matters, to allow summary judgment in favor of William Morrow if summary judgment is inappropriate for Bantam Books.

**4.** We deal, of course, with problems growing out of repeated publications by the defendants, not with *re* publications by third parties, which may or may not be natural consequences of the original publications. *See Weaver v. Beneficial Finance Co.*, 199 Va. 196, 98 S.E.2d 687 (1957).

**5.** *See* Note, *The Choice of Law in Multistate Defamation and Invasion of Privacy: An Unsolved Problem*, 60 Harv.L.Rev. 941 (1947).

**6.** The single publication rule constitutes a departure "from the conventional law of libel." *Hartmann v. Time, Inc.*, 166 F.2d 127 (3d Cir. 1947).

**7.** He treated publication as having taken place for statute of limitations purposes, for all versions of the later paperback edition, on November 20, 1979. He said: "That [November 20, 1979]'s the date of publication. That's the date the action accrued." He further stated: "I am adopting the first-publication rule."

Yet I fail to perceive any proof of actual publication in the affidavit's assertion that the

Perhaps it should be enough to stop there with the observation that, even under the strictest extant version of the single publication rule, a statute of limitations defense has not been made out as the record now stands, so that reversal, properly, is required. However, there remains a closely related potential for error which should be mentioned so that it can be avoided. The case should properly not be decided for the defendants on summary judgment even if, upon reversal, Bantam Books were to supply uncontradicted evidence, by affidavit or otherwise, that a copy (albeit perhaps no more than one) had been sold before December 1, 1979. As a matter of definition, there need, for invocation of the single publication rule, to have been multiple publication. The total lack of information in defendants' affidavits as they now stand, or as they might be amended to bring that of Bantam Books in line with that of William Morrow, as to number of sales should be recognized as a factor making it impossible to determine whether the events making up the distribution of *Spooks* call into play the single publication rule.

Generally we describe the rule as applicable to books. However, we do so not simply because the publication is in book form, but, rather, because it has been widely circulated.[8] Here, however, we have, at the most, eleven days (from November 20, 1979 to November 30, 1979) in which the defendants would have been able to establish sufficient publication (the getting of *Spooks* into the hands of readers) to merit

the calling into play of the single publication rule. They simply have not done so. While I am not willing to regard the question as open in respect to the hardback edition, a minimum of one copy having been sold more than two years prior to the filing of the plaintiff's action, and a second edition have been deemed warranted, indicating some success, it is otherwise for the paperback edition. It must be borne in mind that counsel for the defendants stated at oral argument that the book had not been a commercial success, inferring that sales had not been in large numbers.[9] For the first eleven days of its "available" status, the paperback edition of *Spooks* may not have sold at all, or its sales may have been negligible.[10]

To sum up, I am not aware of any case supporting the defendant's assertion that "availability for sale," regardless of whether any sales in fact have taken place, is the criterion for determining the date of accrual for limitations purposes. See the Annotation, *What Constitutes "Publication" of Libel in Order to Start Running of Period of Limitations*, 42 A.L.R.3d 807, 817 n. 1 (1972):

It is difficult to state whether or not the principle that publication occurs upon release for sale in accordance with trade practice is necessarily inconsistent with the one ... that publication occurs upon mass sale and distribution to the public.

In *Moon v. CBS, Inc.*, Circuit Court of the City of Richmond, No. LD 1544 (June 29, 1980), a Virginia lower court case applying the single publication rule, the court called

paperback was "available for sale." The bullet in the revolver's chamber is *available* for firing, yet actual discharge of the weapon may never take place.

8. Many of the cases invoking the single publication rule simply assume, because, on their particular facts, it was self-evident, that distribution of multiple copies to readers, leading to heavily repeated publication must have taken place.

9. Buttressing that conclusion, the defendants in their answers to the Complaint flatly denied that the copies of *Spooks* had been widely disseminated, advertised, distributed, promoted, and sold.

10. What we manifestly do not have are details as to when sales first occurred, where such sales took place, the number of volumes in the initial sale and all subsequent ones, if any, through November 30, 1979. The only estimate as to the number necessary to constitute a publication a mass publication, bringing the single publication rule into play, may have been one appearing in *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 124, 81 N.E.2d 45, 47 (1948) of "thousands of readers." The *Gregoire* court spoke of release on a given date to the public of "thousands of copies of a single printing or impression." In stating the rule, the court alluded to a publication of "thousands of copies widely distributed."

for proof that the book was "available *and communicated to the public*," *i.e.*, published, that is to say, sold or otherwise actually distributed. In *Hartmann v. Time, Inc.*, 166 F.2d 127, 132, 135 (3d Cir.1947), it was held that accrual occurs where a large distribution is involved "when the issue goes into circulation generally." *Cf. Fleury v. Harper & Row Publishers, Inc.*, 698 F.2d 1022, 1027 (9th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983), a case applying the single publication rule, where it is acknowledged: "A cause of action for defamation does not arise until there has been an unprivileged publication of the libel to a third party."

Some of the cases coming down in jurisdictions other than Virginia purporting to apply the single publication rule seem to have uncritically lumped together two rather separate concepts, without appearing to appreciate that one of them does not dictate the other. It by no means follows, however, that Virginia would do so too. The fact that but one publication may be deemed to have occurred, so that numerous suits, each on a different copy of the same newspaper, magazine or book, may not or need not be brought, does not even indicate, and certainly does not impose, a requirement, for statute of limitations purposes, that the earliest individual item to appear shall determine when the single publication occurred, thereby fixing the date of accrual of the action.[11] Note, *The Single Publication Rule in Libel: A Fiction Misapplied*, 62 Harv.L.Rev. 1041:

> ... there has been an increasing tendency to employ this single-publication fiction for purposes beyond those for which it was originally devised, and to situations where the concept is a complicating and often misleading factor.

*Id.* at 1042.

> ... a publisher with malicious inclinations could still print a great many copies of a libelous article, distribute a few, and, after the statutory period had elapsed, distribute the remainder with impunity. The inequities of beginning the statute of limitations with the first communication of the defamation are more apparent in cases involving libel by books than by newspapers or magazines....

*Id.* at 1043.

> The harsh results occasioned by a single-tort construction of the statute of limitations in the peripheral cases previously considered seem unjustified if the defendant can by other means be adequately protected against multiple suits.....

*Id.* at 1044.

> The term "single publication" was at its inception merely a convenient tool to express the rule that all causes of action for widely circulated libel must be litigated in one trial, and that each sale need not be separately pleaded and proved. By a process of formal logical extension, it has been invoked for purposes where the advisability of its application is questionable....

*Id.* at 1049.

While there are cases which had, almost *sub silentio*, converted "single" publication to "first" publication [12] there are also cases

11. *Cf. Zuck v. Interstate Publishing Corp.,* 317 F.2d 727, 729, 735 (2d Cir.1963) (accrual began when "a contemporary magazine of wide circulation" "first appeared on the newstands for sale to the public, rather than on the date of shipment by common carrier to wholesale distributors").

12. *Hartmann v. Time, Inc.,* 166 F.2d 127 (3d Cir.1947) (Wide distribution throughout the civilized countries of the world in large numbers of an issue of Life magazine by no later than January 14, 1944 was held to bar an action commenced on January 17, 1945); *Gregoire v. G.P. Putnam's Sons,* 298 N.Y. 119, 81 N.E.2d 45

(1948) (Sales of no fewer than 12,300 copies over 2½ years before suit was instituted; the statute of limitations was one year); *Cassius v. Mortimer,* 161 F.Supp. 74 (S.D.N.Y.1957), *affirmed per curiam without opinion,* 252 F.2d 459 (2d Cir.1958) (A diversity action perforce applying New York law involved a book 99% distributed to the trade more than 3½ years before suit was brought. The statute of limitations was one year. The plaintiff's sole contention was that limitations should not be governed by the single publication rule. He manifestly was in no position, in light of the long delay to contend, as the plaintiff may be able to do here,

accepting what appear to be more reasoned approaches.[13]

It seems to me quite possible that, even if ultimately enough copies of *Spooks* were sold to bring at some time the single publication rule into play, nevertheless the correct date to choose for accrual purposes— *i.e.*, for the commencement of the running of limitations—would not be the earliest date on which even a single copy was sold or otherwise distributed to a member of the public, but rather would be the first date by which a sufficient number had been published to render the single publication rule applicable.

Furthermore, if it should turn out that there were sufficient copies of the paperback version of *Spooks* published before December 1, 1979 to establish that the single publication rule, for limitations purposes, would normally be applied as of a date prior to December 1, 1979, there will remain for resolution the question of the significance of the printed date of publication, sometime in December 1979, appearing on the copies of the paperback edition. If it were to control, for accrual purposes, obviously the suit, commenced December 1, 1980, would have been timely.

It is, of course, common knowledge that *magazines* customarily show a later "official" publication date than the actual one. First reaching the news stands in mid-October, a magazine may describe itself as the November issue. The practice probably is designed to give an appearance of timeliness even to copies which, first picked up and read in late November, may in fact be sadly dated. Perhaps such considerations led the court in *McGlue v. Weekly Publications, Inc.*, 63 F.Supp. 744 (D.Mass.1946) to conclude, so far as the widely disseminated magazine Newsweek was concerned, that, for single publication rule purposes, the actual date of appearance and sale and not the ostensible date published on the magazine should control. However, Newsweek has had enormous readership, and it would have been reasonable for the court to have taken judicial notice of general awareness of the unreliability of the "official" issue date, so far as Newsweek was concerned, to ascertain when publication first occurred.[11]

Customary facts respecting *books* may be the same, but they may just as well be different, from those for magazines.[15] We

that, although the single publication rule did apply, still a year had not passed from the date on which accrual occurred).

**13.** *Dominiak v. National Enquirer*, 439 Pa. 222, 266 A.2d 626 (1970) (rejecting the initial publication as the one constituting accrual, the majority opting for *any* one publication, but restricting recovery to damages for those appearing within one year prior to the date of filing suit. One concurrer, of 7 judges, selected as the accrual date the time when the publication reaches the allegedly defamed individual's community. Two others preferred the date of first publication in the state in which suit is brought.); *Wildmon v. Hustler Magazine, Inc.*, 508 F.Supp. 87, 91 (N.D.Miss.1980) ("... the cause of action for libel in a mass distributed publication accrues when the periodical is *substantially* distributed to the public ...") (emphasis supplied).

**14.** *Cf. Hartmann v. Time, Inc.*, 166 F.2d 127, 135 (3d Cir.1947):

We are aware that the plaintiff makes the argument that the defendant's affidavits do not show that there was a reading of the accused material prior to January 17 [the "official" publication date stated on copies of

the issue of the magazine], and that since there is no proof of publication in the legal sense prior to that date, the motion for summary judgment pursuant to Rule 56 should not have been granted. We are not willing to dispose of the motion on such a narrow ground. We cannot believe, in view of the great number of magazines which comprised the issue, that "Life" dated January 17 was not read by persons not privileged within the two or three days which followed its very widespread distribution. To hold otherwise would be totally unrealistic and would inflict a wooden and a senseless interpretation on Rule 56.

*Cf.* also *Winrod v. Time, Inc.*, 334 Ill.App. 59, 78 N.E.2d 708 (1948) (also dealing with an issue of the widely disseminated Life magazine published 2 days before the date printed on the cover).

The important distinction from the present case lies in the evident fact that widespread distribution of *Spooks*, prior to December 1, 1979, has not been established.

**15.** Consider *Khaury v. Playboy Publications, Inc.*, 430 F.Supp. 1342, 1344 n. 1 (S.D.N.Y.1977) where an issue of the magazine OUI bore a publication date of October 1975, but an on-sale date of September 4, 1975 was designated. A

know, for summary judgment purposes at least, that the book *Spooks* did not enjoy commercial success, and that it was not widely sold. Additional facts are needed to ascertain, in the case of *Spooks*, whether Bantam Books, the publisher for the paperback edition of that book, and for other books brought to market by it, as a customary matter, consistently chose an unrealistically late date when designating the time at which publication was expected to occur.[16] Details so far lacking as to whether the plaintiff knew, or should have known, of the practice would also be necessary to permit intelligent analysis and resolution of the issue of whether the publisher was estopped from asserting a publication date different from the very one which it had asserted. We do not know, as things stand now, when news of the appearance of the paperback edition of *Spooks* first came to the plaintiff's attention.

All in all, both sides have participated in a presentation of facts too inadequate to permit as yet decision as to whether, and, if so, to what extent, an embossed later publishing date can be ignored in favor of the earliest date on which a multiple publication in fact has come to market.[17] For

example, many daily morning newspapers of wide circulation publish limited bulldog editions, copies of which appear on the streets and are sold prior to midnight and, therefore, on the day before the date set out in the masthead. It seems in those circumstances unlikely that the customary one year statute of limitations for defamation will automatically be reduced to 364 days because of a non-negligible, but certainly not primary distribution on the day prior to the date on which the newspaper principally is sold.[18] In the same fashion, if the bulk of the publication of the paperback edition of *Spooks* occurred only on or after December 1, 1979, thus conforming to the printed "official" publication date, perhaps that date should be selected as the one on which accrual for limitations purposes first took place.

If it were determined, as I believe it should be, that, at the present state of development of the record, a judgment in defendants' favor on statute of limitation grounds would be unwarranted, we must consider not only the defamation claim but also the other tort claims asserted by the plaintiff as well.[19] First the claim for inva-

total of 1,779,990 copies were distributed to the public well before September 22, 1975. Suit was filed on September 22, 1976. In refusing to give effect to the official publication date, the court declined to rule "that the industry-wide practice of post-dating magazines constitutes 'active concealment.' "

**16.** Defendants place reliance on *Fleury v. Harper & Row Publishers, Inc.,* 698 F.2d 1022 (9th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) as rendering the "official" publication date for a book immaterial. However, the publisher abided by its prognosis of a November 1978 release date, subsequently made more specific as November 9, 1978. On or before November 14, 1978 shipment of 30,000 copies had been made, and by November 14, 1978 display, delivery, communication *and sale* in New York City had occurred. Suit commenced on November 16, 1979 was therefore time-barred, and the publisher's disclosure rendered practically impossible the reliance needed to generate an estoppel for the date of December 25, 1978 selected by the author as the "official" publication date.

**17.** Certainly *Moon v. CBS, Inc., supra,* is not dispositive since there the official publication

date was October (exact date unspecified) of 1979. Suit was not instituted until October 22, 1980, so the chances were better than 2 to 1 that limitations had run even if the plaintiff was entitled to rely and did rely on the official publication date. In *Moon,* a lulling into false security, and hence any basis for estoppel in the plaintiff's favor, consequently, were lacking. We need, for purposes of the case *sub judice,* yet to know the facts before addressing any such question.

**18.** *See,* however, *Belli v. Roberts Bros. Furs,* 240 Cal.App.2d 284, 49 Cal.Rptr. 625 (1966). The case has limited relevance, however, depending, as it did, on a peculiarity of wording of the California Uniform Single Publication Act, and concerning, not a newspaper publisher, but a non-news media defendant.

**19.** Plaintiff has not spelled out the actual words complained of as libelous, merely alleging that they were "false," "malicious," and "concerning the plaintiff." Defendants, however, did not seek greater precision or clarity under Fed.R. Civ.P. 12(e). They have not contended that the words were not libelous. Therefore, no issue exists, at this stage of the proceedings, as to

sion of privacy under Virginia law will simply not bear investigation. Regardless of limitations questions, a substantive claim has simply not been made out. The plaintiff has not, as apparently he could not, have proceeded under the Virginia statute. Va.Code § 8.01–40 (1977 Repl.Vol.). Yet Virginia authority, binding on us in a diversity case, does not recognize a common law, as distinguished from a statutory, cause of action for invasion of privacy. *Brown v. American Broadcasting Co., Inc.*, 704 F.2d 1296, 1302–03 (4th Cir.1983).

Furthermore, there is no occasion to investigate, particularly in connection with the invasion of privacy count, the question of whether District of Columbia tort claims exist in favor of the plaintiff which could be asserted in an action commenced in the United States District Court for the Eastern District of Virginia. It might prove a tortured inquiry. In a perceptive law review publication, Note, *The Choice of Law in Multistate Defamation and Invasion of Privacy: An Unsolved Problem*, 60 Harv.L.Rev. 941 (1947), the author canvasses several possibilities, among them (a) recovery on a distinct cause of action for each state, applying the law of each state and (b) recovery simply and solely under the law of the plaintiff's domicile. He points out the advantages and disadvantages of each possibility, concluding that none is perfect. "Neither a double choice for the plaintiff, a double choice for the distributor, nor a harshly monistic application of the domiciliary law seems satisfactory." *Id.* at 951.

However, assuming, but not deciding, as the plaintiff asserts, that a cause of action might have been sufficiently pleaded under the substantive law of the District of Columbia, if and to the extent the alleged invasions of the right of privacy took place in the District, the fatal defect in the complaint lies in the absolute failure to assert any occurrences whatever in the District of Columbia. While it is appropriate to conclude that a complaint by a Virginia resident, filed in a United States district court which functions in Virginia inferentially alleges Virginia events, *see, e.g.*, Restatement (Second) of Conflict of Law § 150(2) (1971) ("When a natural person claims that he has been defamed by an aggregate communication, the state of the most significant relationship will usually be the state where the person was domiciled at the time . . .), it is not justifiable simply to assume, absent any supporting allegations, the existence of occurrences constituting an invasion of privacy in the District of Columbia, 49 other states, Canada and perhaps the remainder of the civilized world. *See generally, Id.*, § 153, Comment B.

Finally, and the consideration applies to the defamation and injurious falsehood claims as well as to invasion of privacy, the statute of limitations in the present action in the Virginia district court is for every count one year. There being no common law invasion of privacy tort in Virginia, no other time limit, obviously, is set for it. Any allowance of an amendment to plead torts alleged to have occurred in the District of Columbia would still have to satisfy the one year statute of limitations, counting from December 1, 1980. Relation back should not be permitted for, if an amendment to declare on distinct and independent D.C. torts were allowed, that new pleading should meet its own limitations requirements. Fed.R.Civ.P. 15(c); *Jackson v. Ideal Publishing Corporation*, 274 F.Supp. 318, 320 (E.D.Pa.1967) ("Thus to permit plaintiff to amend . . . would be an allowance to amend around the statute of limitations."). Counting from some date in 1984 the likelihood that publication happened on or after a date in 1983 is too unlikely to be given credence. Of course, all this is said without prejudice to institution by the plaintiff in the District of Columbia of an action if the limitations bar of that jurisdiction has not yet arisen.

There remains the injurious falsehood claim. The story, as it has been developed in the pleadings to date, remains far too

whether substantively an actionable case of defamation has been made out. *See, e.g., United* *States v. Chesapeake & Ohio Rr.*, 215 F.2d 213, 216 (4th Cir.1954).

incomplete to judge whether, assuming that limitations have not run, a cause of action for injurious falsehood also exists in Virginia. Decisional law and statute are both silent on the subject. They say neither "Yea" nor "Nay." That means only that neither the court, nor the parties, have located any Virginia decision either recognizing, or refusing to recognize, such a cause of action. However, the fact that a blatant lie is not defamatory should not preclude recovery if it in fact harms and especially if it has been uttered by a defendant intending to injure.[20] Thus, one competitor for a job might speak or write of another that he or she is lacking one controlling qualification. He might assert nonage of someone actually 21 years (or now customarily 18 years) of age. He might claim that the other person was too tall or too short, thereby failing to meet a controlling size requirement for the job. The knowing lie would not defame, but if the plaintiff could prove that he would have been the one hired, absent the deliberate misstatement of fact, he should be permitted to recover. *See* Prosser *supra*, § 128, pp. 915–926.

No reason readily appears why Virginia law would not so hold. The common law jurisdictions having had occasion to consider the matter have generally accepted the existence of injurious falsehood as a viable tort. The fact that the question has never come on for decision in the Commonwealth is scant reason for denying the existence of a cause of action. There must be a first time for nearly everything. Consequently, if the actual words relied on as constituting an inexcusable falsehood should, when pleaded, turn out to constitute a lie, especially a deliberate lie, it is quite possible that the cause of action, having reared its head for the first time in Virginia, is indeed viable in the Commonwealth.

For the reasons advanced, I would reverse. At the same time, I should not wish to appear unsympathetic to a district judge dealing with an inept performance by counsel for one of the parties (the plaintiff himself). In the event of remand the district judge would surely be possessed, in case of a similar inadequate performance, of plenary power to dispose finally of the case without exceeding his discretionary powers, and, especially, without further amendment beyond that contemplated in this opinion.

At the same time, it should not be ignored that defendants' counsel did not do all in their power to make matters easier for the district judge to understand. Perhaps, if counsel belatedly brought into the case to represent the plaintiff on appeal were to remain, and were the case reversed and remanded, such egregious inadequacies in lawyerlike performance would be avoided.

---

**20.** Words not defamatory in themselves may support a recovery if, by proper incorporation into the complaint of inducement or colloquium, topped off with an indicative innuendo, the plaintiff pleads that the words were defamatory in application and so understood by the defendant. The fact that in actions for libel recovery of general damages has been greatly circumscribed, *see e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), is no reason for concluding that there is no injurious falsehood cause of action in Virginia. For the cause of action for injurious falsehood has always required the proof of actual damages. *See, e.g.,* Prosser, W., *Law of Torts,* § 128, pp. 915 ff. (4th Ed.1971) ("... in every case the plaintiff must prove special damage, in the form

of loss of a present or prospective advantage, ..." *Id.* at 917).

In other words, it does not follow that, where injury proceeds from the use of words because of their untruthfulness rather than their libelous content, and harm is demonstrated to have occurred, recovery is barred. Quite to the contrary, the law customarily supplies a remedy to right a wrong.

In short, the reason advanced by the defendants as to why Virginia should be deemed not to recognize the tort of injurious falsehood is simply that the cause of action, wherever it appears, is a rarity. The defendants advance no grounds for the proposition *that a deliberate and injurious lie about a plaintiff resulting in demonstrable harm should not suffice to justify recovery.*