Malvin W. BRUBAKER, Appellant,

Richmond Financial Holding Company, Incorporated; Richmond Financial Corporation; Richmond Financial Advisory, Incorporated, Plaintiffs–Appellants,

v.

CITY OF RICHMOND; Claudette B. McDaniel; Alfred E. Smith; Vernon F. Williams, Jr., Defendants–Appellees,

and

Thomas E. Carter; United Daniels Securities, Incorporated, Defendants.

No. 90–1523.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1991.

Decided Aug. 8, 1991.

As Amended Aug. 23, 1991.

Gary C. Leedes, University of Richmond Law School, Richmond, Va., argued (Thomas H. Roberts, Roberts & Landry, P.C., on brief), for plaintiffs-appellants.

Beverly Agee Burton, Asst. City Atty., Richmond, Va., argued (G. Timothy Oksman, City Attorney's Office, James Edward

Sheffield, James E. Sheffield & Associates, P.C., on brief), for defendants-appellees.

Before RUSSELL and HALL, Circuit Judges, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

## OPINION

HILL, Senior Circuit Judge:

This case concerns the propriety of Rule 11 sanctions awarded to the defendants named in a sprawling 67–page complaint containing 294 numbered paragraphs and 204 pages of exhibits. Although the nearly incomprehensible, four-count complaint was inordinately lengthy and confusing, plaintiffs' grievance can be stated rather simply: plaintiffs (investment services firms) alleged that defendants, in the course of furthering their political and financial objectives, had schemed to deprive plaintiffs of Minority Business Enterprise certification and has prevented them from receiving business from city-related investment projects. After being vindicated on all counts, five of the six defendants brought motions for Rule 11 sanctions against plaintiffs. The district court granted these motions, sanctioning plaintiffs and their trial counsel. On appeal (with appellate counsel representing plaintiffs and their trial counsel), the sole issue is whether the Rule 11 sanctions were appropriate. It is at this point that we begin our foray into this maze.

## I. THE SETTING

The leading characters consist of three plaintiffs, their trial attorney, and six defendants. The plaintiffs are Richmond Financial Holding Company, Inc. ("RFHC") and its wholly owned subsidiaries, Richmond Financial Corporation ("RFC") and Richmond Financial Advisory, Inc. ("RFA"). RFC is a New York broker/dealer of securities registered to do business in Virginia, while RFA is a Virginia corporation engaged in the business of providing investment advice. The plaintiffs' trial at-

torney is Malvin W. Brubaker, of Richmond, Virginia, who took and passed the Virginia state bar examination in 1987. The defendants are: the City of Richmond, Virginia ("the City"); Claudette B. McDaniel, a member of the Richmond City Council and the chairperson of the council's liaison committee with the Richmond Human Relations Commission ("HRC"); Alfred E. Smith, the executive director of the HRC; Vernon F. Williams, Jr., a compliance specialist with the HRC; Thomas E. "Tony" Carter, a former stockholder, director and president of RFHC; and United Daniels Securities, Inc. ("United Daniels"), a New York corporation. What follows is a summary of many of the allegations contained in the plaintiffs' complaint.

Initial allegations include a description of the personal connections between certain of the characters. McDaniel and Carter were allegedly close friends, and Carter managed McDaniel's re-election campaign in 1986. Carter and McDaniel also had a relationship with United Daniels through Willie Daniels of that firm, who is said to have made a contribution to McDaniel's campaign.

Plaintiffs' yarn goes on to explain the formation of RFHC. In early 1985, McDaniel approached Nick Skaltsounis of Anderson & Strudwick, a Richmond brokerage firm, about the possibility of forming a minority investment services firm in Richmond. Carter was also an employee at Anderson & Strudwick at that time. RFHC was incorporated in June, 1985, with Carter as its director. Among those solicited to invest in RFHC was Alfred Smith, who received a Private Placement Memorandum that was later withdrawn by Carter.

In August, 1985, the Richmond Supplemental Retirement System ("RSRS") issued a request for proposals to manage certain assets it held. A number of firms submitted bids and indicated that they would, in varying degrees, utilize firms certified by the City as Minority Business Enterprises ("MBE").[1] McDaniel informed

---

1. An MBE is defined by Richmond, Va., City Code § 12–23, p. 941 (1985) as follows:

Carter about the RSRS contract and encouraged him to seek MBE certification for RFHC. RFHC did not, however, have 51% minority ownership; Carter was the only minority owner and held only a small percentage of the shares.[2] Prior to applying for MBE certification, Carter altered his stock certificate and the minutes of an RFHC board meeting to indicate that he owned a majority of the outstanding shares. Carter then applied for MBE certification for RFHC. After correspondence back and forth with Vernon Williams, Williams sent Carter a letter refusing to certify RFHC. Carter then appealed to Alfred Smith, who certified RFHC shortly thereafter.

Carter was not with RFHC long. In June of 1986, Nick Skaltsounis and Paula Collier, the Secretary and Treasurer of RFHC, respectively, discovered that Carter had made false statements on his application for employment as a broker with a brokerage firm, and Carter resigned from RFHC at their request. Skaltsounis also requested that Carter return his stock certificates; McDaniel was the person who actually returned them. After Carter's resignation, Skaltsounis and Collier hired Colston Lewis, Jr., a minority, as the new president of RFHC and set out to attract minority investors in order to reach the 51% minority ownership level. Also subsequent to Carter's resignation, RFHC acquired its two wholly-owned subsidiaries, RFA and RFC. In March, 1987, RFHC achieved 51% minority ownership.

RFHC reapplied for MBE certification in April, 1987, and sought participation as an MBE in a contract to manage the RSRS funds. In late May, Vernon Williams notified RFHC by letter that it would not be certified as an MBE because the composition of its board of directors (two minorities and two non-minorities), together with its quorum rules (a majority of the board con-

stituted a quorum), permitted control of RFHC by non-minorities. The decision not to certify RFHC affected RFA's chances for participation in the RSRS contract.

In late June, RFHC appealed the non-certification decision. Alfred Smith sent a letter to RFHC's attorney (not its trial counsel) in early September stating that RFHC had attained MBE status. RFHC assumed that its subsidiaries were included in the certification.

Tobacco Row Associates, a development group that planned to convert abandoned warehouses in Richmond into housing and commercial space, had an agreement with the City to use minority firms for at least 20 percent of its bond underwriting and sales. In late August, Mr. Lewis sent a letter to Tobacco Row's managing general partner expressing RFHC's interest in participating in the project through its broker/dealer subsidiary RFC. In November, Mr. Lewis discovered that, despite RFHC's certification, RFHC was not on a list of certified MBE's provided to the general partner by the HRC. The list was in the form of a memorandum dated October 15, 1987, from Vernon Williams to Claudette McDaniel, with a copy to Alfred Smith, that listed 10 certified MBEs. None of these people notified Tobacco Row's managing partner that RFHC had been omitted from the list. By the time Lewis notified the general partner that RFHC was certified, Tobacco Row had already met part of its 20% commitment by including two firms listed in the October memorandum. One of the firms, United Daniels, was not registered with the State Corporation Commission to transact business in Virginia. RFHC's former president, Carter, had become affiliated with United Daniels by this time. Lewis continued to try to get some of the business from Tobacco Row and was told by the general partner that someone in the City had informed him that RFHC's

---

a business at least fifty-one (51) percent of which is owned and controlled or fifty-one (51) percent minority-owned and operated by minority group members or, in case of a stock corporation, at least fifty-one (51) percent of the stock which is owned and controlled by minority group members.

"Minority group members" are "citizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos or Aleuts." *Id.*

**2.** Carter held 5,000 of the 29,500 shares outstanding.

broker/dealer subsidiary had to be certified before its involvement could be counted toward the 20% minority participation goal. RFC applied for certification in February, 1988, and was granted certification that month. After certification, RFC received only 5% of the 20% minority participation.

On September 21, 1988, the Richmond News Leader reported that the Federal Bureau of Investigation was investigating three issues involving Claudette McDaniel, one of which was the MBE certification of RFHC. In that article, Alfred Smith stated that his office had reservations about RFHC, under both Carter and Lewis, because it showed signs of being a "front." RFHC and RFC have had virtually no business since the article and other follow-up articles were published.

Having extracted the above sad story of plaintiffs' frustration from the voluminous filing in the nature of a complaint, one finally reaches the counts of the complaint. In their first count, plaintiffs alleged that all defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1988). More specifically, plaintiffs alleged that defendants violated section 1962(c) by conducting or participating in the conduct of the affairs of certain enterprises (including RFHC and United Daniels) through a pattern of racketeering activity. Plaintiffs also contended that defendants violated section 1962(d) by conspiring to violate section 1962(c).[3]

Count II alleged that the City, McDaniel, Smith, and Williams had deprived plaintiffs of equal protection and due process in violation of 42 U.S.C. § 1983 (1988).[4] The essence of plaintiffs' equal protection claim was that after Carter left RFHC, defendants applied a much more exacting certification process to them than to other potential MBE firms and intentionally frustrated their efforts to participate in projects such as the Tobacco Row bond underwriting group. The substantive due process claim maintained that defendants acted irrationally, arbitrarily, and capriciously in denying reorganized RFHC's initial application for certification and in requiring separate certification for RFC. Plaintiffs claimed they were denied procedural due process because defendants failed to provide them with a list of criteria for judging MBE applicants, failed to adhere to definite standards for certification, and could not have fairly evaluated post-Carter RFHC given the relationship between Carter, McDaniel, and Smith.

Count III alleged that defendants libeled, slandered, and defamed plaintiffs. This claim largely was based on the October 15, 1987, memorandum listing certified MBEs and on Smith's statements to the newspaper.

Finally, Count IV alleged violations of the Virginia Conspiracy Act, Va.Code Ann. § 18.2–499 (1988) by all defendants except Williams.[5]

---

**3.** 18 U.S.C. § 1962(c) (1988) provides in relevant part as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(d) (1988) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**4.** The relevant portion of 42 U.S.C. § 1983 (1988) states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immu-

nities secured by the Constitution and laws, shall be liable to the party injured.

**5.** Va.Code Ann. § 18.2–499 (1988) provides in part:

(a) Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 3 misdemeanor.

Va.Code Ann. § 18.2–500(a) (1988) provides civil relief, including treble damages, for one "injured in his reputation, trade, business or profession by reason of a violation of § 18.2–499."

## II. ACT 1: THE DISAPPEARANCE OF PLAINTIFFS' CLAIMS

Enter the character whom plaintiffs now cast as the villain in their drama: the district judge. The district judge permitted no claims to reach the jury. Although none of the dismissals are the subject of this appeal, we discuss the fate of each merely to aid the understanding of why sanctions were imposed and our view of those sanctions.

The district court dismissed the RICO count as to all defendants on their Fed. R.Civ.P. 12(b)(6) motions. Citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), the court determined that a plaintiff must allege, among other things, conduct of an enterprise through a pattern of racketeering activity. After *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the district court concluded that the pattern requirement involved three issues: (1) whether the plaintiff has alleged *at least two predicate acts*; (2) whether there is sufficient *relatedness* among the predicate acts; and (3) whether there is sufficient *continuity* among the predicate acts. The district court found that plaintiffs had failed to make sufficient allegations of either relatedness or continuity. The court commented that rather than being related, the predicate acts alleged to have occurred while Carter was president of RFHC were opposite to those alleged to have occurred after Carter left RFHC. As for continuity, the district court concluded that the alleged scheme lasted at most for 18 months and that this amount of time was insufficient, especially given the mixed commercial and political context.

Although the district court dismissed the section 1983 claims against Smith and Williams only at trial on their motions for directed verdict, the district court dismissed the section 1983 count against the City on its 12(b)(6) motion. The court concluded that plaintiffs had offered only a single conclusory allegation that the review afforded their MBE application was the policy and custom of the City, and not only did plaintiffs provide no factual support for this allegation, but other allegations in the complaint indicated that the alleged constitutional deprivations had occurred because of *departures* from the City's policies and customs.

The district court also dismissed the section 1983 claim against McDaniel prior to trial. In granting McDaniel's motion for summary judgment, the court determined that:

> plaintiffs have produced no evidence that McDaniel was even involved in the decisionmaking processes which they claim deprived them of due process and equal protection.
>
> Nor have plaintiffs produced any evidence that McDaniel was involved in any conspiracy to injure them in their business or otherwise. Plaintiffs' "evidence" as to McDaniel's involvement in either count is nothing more than a collection of immaterial "facts" and speculative inferences.

R4–83–2–3.

As for the defamation count, the district court granted all motions to dismiss concerning the October 15, 1987, memorandum because plaintiffs' claims arising from that document were time-barred. Under Va. Code Ann. § 8.01–248 (1984) and applicable case law, a plaintiff must bring a defamation claim within one year after the cause of action has accrued, and plaintiffs filed their complaint over one and a half years after the cause of action accrued. Regarding Smith's statements to the newspaper, the court noted that there were no allegations that any other individual played a role in his statements, and also that the plaintiffs did not allege that the City had directed, authorized, or ratified Smith's statements. The district court thus granted all motions to dismiss regarding the Smith statements, except Smith's.

On count IV, alleging violations of the Virginia Conspiracy Act, the district court granted only the City's Rule 12(b)(6) motion. The court granted the City's motion:

because municipalities are incapable of forming criminal intent,[6] because punitive damages are generally unavailable against municipalities, because the Virginia legislature showed no intent to derogate from this general rule in enacting the Conspiracy Act, and because policy considerations counsel against subjecting municipalities to the punitive damages called for under the Act's civil prong. R5–101–21. The court dismissed the claim against McDaniel on her motion for summary judgment for the reasons stated in the grant of summary judgment as to the section 1983 claim, as reviewed above. Although the order does not appear, the record does reflect that the district court dismissed the conspiracy claim against Smith, also, on his motion for summary judgment. Plaintiffs voluntarily dismissed this count against Carter and United Daniels on the morning of trial.

## III. ACT 2: THE DISTRICT JUDGE MAKES GOOD ON HIS SANCTIONS WARNING

Having earlier warned plaintiffs that he would consider Rule 11 sanctions, the district judge followed through on this warning in response to sanctions motions from all defendants except Carter. As a result of Count I, for RICO violations, the court ordered sanctions in favor of the City, McDaniel, Smith, and United Daniels.[7] On the section 1983 claim, the district court awarded sanctions to the City and McDaniel. On Count III, for libel, slander, and defamation, the court awarded sanctions to the City, McDaniel, Williams, and United Daniels. Count IV, for violations of the Virginia Conspiracy Act, resulted in sanctions awarded to the City, McDaniel, Smith, and United Daniels. The court imposed sanctions on plaintiffs and their attorney, Malvin Brubaker, jointly and severally.[8]

The district court gave two reasons for awarding sanctions to the City on Counts I and IV. First, citing the three district court cases listed in footnote 6, the judge concluded that plaintiffs should have known that the City was incapable of forming the criminal intent necessary for liability under either RICO or the Virginia Conspiracy Act. The judge's second reason was factual. He concluded that plaintiffs had no evidence to support their allegations that the City was involved in a scheme to prevent them from obtaining MBE certification or securing investment business. The court awarded sanctions on Count II because of plaintiffs' single conclusory allegation of policy and custom, which "was without factual support and was contradicted by other allegations in the complaint" that asserted *departures* from the City's policies and customs with respect to MBE certification. Sanctions Order, Aug. 14, 1990, ("Sanctions Order") p. 7. As for Count III, the district judge awarded sanctions based on the October, 1987, memoran-

---

**6.** For this proposition, the court cited three district court cases from around the country: *Albanese v. City Fed. Sav. & Loan Ass'n,* 710 F.Supp. 563 (D.N.J.1989); *In re Citisource, Inc. Securities Litigation,* 694 F.Supp. 1069, 1079 (S.D.N.Y.1988); *Massey v. City of Oklahoma City,* 643 F.Supp. 81, 85 (W.D.Ok.1986).

**7.** Throughout this opinion, we use language such as "sanctions in favor of ...," "awarded sanctions to ...," "sanctions awarded to ...," and other similar expressions. We use these expressions merely as part of identifying the particular grounds on which the district court awarded sanctions against appellants and to identify the issues we are discussing. By use of this language, we do not mean to imply that Rule 11 focuses on damages incurred by the offended party. On the contrary, Rule 11 focuses on the malfeasor. The primary purpose of Rule 11 is not compensation of the offended

party, but rather deterrence of future litigation abuse. *In re Kuntsler,* 914 F.2d 505, 522 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991).

**8.** Aside from the other issues asserted by appellants, they point out that the case against United Daniels was dismissed pursuant to a stipulation of dismissal agreed to by United Daniels. Appellants contend that this stipulation constituted a satisfaction of all claims between the parties and, in a brief served upon counsel for United Daniels, point out that United Daniels "does not intend to contest plaintiffs' appeal." United Daniels has filed no brief in this appeal. We conclude that United Daniels has voluntarily abandoned any claim to attorneys' fees or other rights granted as sanctions against appellants and for that reason direct that the judgment awarding sanctions to United Daniels be vacated.

dum because "a cursory review of Virginia limitations law should have demonstrated to plaintiffs that any defamation claims involving that memorandum were time-barred." *Id.* The court awarded sanctions based on Smith's statements because plaintiffs should have known that the City's failure to direct, authorize, or ratify the Smith statements meant that plaintiffs lacked a claim against the City for the statements. The district court determined the amount of sanctions by adding the reasonable attorneys' fees and the other reasonable expenses. In all, the court ordered plaintiffs and their attorney to pay the City $21,156.24 in sanctions.[9]

The court awarded McDaniel reasonable expenses, other than attorneys' fees, that she incurred in defending against the RICO and defamation counts. The court's justification for awarding sanctions on the RICO count was that a reasonable investigation of the facts and applicable law would have shown plaintiffs that they had "no basis for attempting to implicate McDaniel in any alleged scheme to deprive them of MBE certification or to damage their business prospects." *Id.* at 9. As for the defamation count, the court reiterated that a reasonable inquiry would have shown plaintiffs that they were time-barred from bringing a claim based on the October, 1987, memorandum. The court awarded McDaniel reasonable expenses, including attorneys' fees, in connection with the section 1983 and Virginia Conspiracy Act claims. Although not frivolous when filed, the court determined that plaintiffs violated Rule 11 by continuing to pursue those claims until summary judgment after gathering no evidence that McDaniel was involved in the decision making process they claimed deprived them of their constitutional rights or that McDaniel was involved in a conspiracy to injure them. The court also awarded McDaniel the expenses that she incurred in preparing her motion for sanctions. In total, the district court awarded $18,435.62 to McDaniel.[10]

**9.** The sanctions were broken down as follows:

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| G. Timothy Oksman | 81.90 * | $170 | $13,923.00 |
| Beverly A. Burton | 30.65 ** | 130 | 3,984.50 |
| William Joe Hoppe | 17.00 | 150 | 2,550.00 |
| | | | 20,457.50 |
| Charge from National Legal Research Group for legal research, writing, editing and analysis | | | 698.74 |
| | | | $21,156.24 |

\* Oksman indicated that he had spent 117 hours, but the district judge found that only 70% of that time was reasonably expended.

\*\* 12.2 of these hours include time spent on the City's motion for sanctions.

**10.** This amount was broken down as follows:

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| James B. Thorsen | 8/7/89–9/14/89: | | |
| | 29.8 hours | $95 | $2,831.00 |
| | 9/19/89–9/25/89: | | |
| | 21.75 hours | | 2,066.25 |
| | 9/27/89–10/31/89 | | |
| | 29.00 hours | | 2,755.00 |
| | 11/5/89–12/4/89: | | |
| | 13.55 hours * | | 1,287.25 |
| Eric M. Page | 8/10/89–9/8/89: | | |
| | 10.30 hours | 95 | 978.50 |
| | 10/20/89–10/31/89: | | |
| | 5.80 hours | | 551.00 |
| | 11/27/89–12/4/89: | | |
| | 9.25 hours ** | | 878.75 |

The district court awarded Smith sanctions on the RICO and Virginia Conspiracy Act counts because the judge found that plaintiffs "simply had no basis in fact for their allegations that Smith was involved in a scheme or conspiracy.... On the contrary, the evidence clearly showed that each time plaintiffs sought MBE certification, Smith certified them." *Id.* at 12. The district court estimated that Smith's attorneys spent 30% of their time defending these counts and awarded Smith $10,594.95.[11]

The district court awarded Williams sanctions on the defamation count because, as noted above, any defamation claim based on the October, 1987, memorandum was clearly time-barred. Having determined that only one of the two counts against Williams was frivolous, the district judge ordered that Williams be reimbursed for half of his reasonable expenses, including attorney's fees, incurred between the filing of the complaint and the dismissal of the defamation count. The court also specifically awarded Williams expenses incurred in preparing his motion for sanctions. The total awarded was $3,926.25.[12]

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| Jeffrey R. Allen | 8/7/89–8/24/89: | | |
| | 10.50 hours | 95 | 997.50 |
| | 10/17/89–10/31/89: | | |
| | 18.70 hours | | $1,776.50 |
| | 11/14/89–11/26/89: | | |
| | 8.00 hours *** | | 760.00 |
| | | | 14,881.75 |
| Expenses | | | 3,553.87 |
| | | | $18,435.62 |

* 1.0 of these hours was spent on McDaniel's motion for sanctions.

** All of these hours were spent on McDaniel's motion for sanctions.

*** 6.0 of these hours were spent on McDaniel's motion for sanctions.

**11.** This amount was broken down as follows:

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| Jacqueline G. Epps | 206.70 | $120.00 | $24,804.00 |
| James W. Morris III | 12.90 | 160.00 | 2,064.00 |
| John D. Epps | 0.50 | 110.00 | 55.00 |
| Deborah A. Holloman | 0.50 | 85.00 | 42.50 |
| Janet P. Selph | 30.00 | 85.00 | 2,550.00 |
| *Paralegal* | | | |
| A. LaFerne Gaunce | 18.60 | 45.00 | 837.00 |
| Martha P. Clampitt | 0.20 | 65.00 | 13.00 |
| Jennifer R. Boyle | 11.20 | 45.00 | 504.00 |
| Wanda R. Castelvecchi | 6.30 | 55.00 | 346.50 |
| Glen A. Lea | 58.60 | 55.00 | 3,223.00 |
| | | | 34,439.00 |
| Expenses | | | 877.50 |
| | | | $35,316.50 |

30% of $35,316.50 is $10,594.95.

**12.** The amount of sanctions was broken down as follows:

| Attorney | Hours | Hourly Rate | Fee |
|---|---|---|---|
| Reginald M. Barley | 76.75 | $90 | $6,907.50 |
| | one-half of $6,907.50 is | | $3,453.75 |
| | 5.25 (sanctions motion) | | 472.50 |
| | | | $3,926.50 |

## IV. ACT 3: THE APPEAL

### A. *RULE 11* [13]

Fed.R.Civ.P. 11 states, in relevant part: The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

■ The language of Rule 11 requires that an attorney conduct a reasonable investigation of the factual and legal basis for his claim before filing. *See Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 987 (4th Cir.1987). The prefiling investigation must appear objectively reasonable. *In re Kuntsler*, 914 F.2d 505, 514 (4th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991). Inexperienced or incompetent attorneys are not held to a lesser standard under Rule 11. *Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir.1987).[14] In evaluating the reasonableness of the investigation, it must be remembered that Rule 11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." Fed.R.Civ.P. 11, notes of advisory committee on 1983 amendment. Rule 11 "does not seek to stifle the exuberant spirit of skilled advocacy or to require that a claim be proven before a complaint can be filed." *Cleveland Demolition Co.*, 827 F.2d at 988. It should also be remembered that unartful pleading, such as through a vague and conclusory complaint, is irrelevant to the factual and legal inquiry required under Rule 11. *Simpson v. Welch*, 900 F.2d 33, 36 (4th Cir.1990). "[C]reative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." *Davis v. Carl*, 906 F.2d 533, 536 (11th Cir.1990).

■ To be reasonable, the prefiling factual investigation must uncover some information to support the allegations in the complaint. A complaint containing allegations unsupported by *any* information obtained prior to filing violates the required prefiling factual investigation. *In re Kuntsler*, 914 F.2d at 516. That is, where there is *no* factual basis for a plaintiff's allegations, the complaint violates Rule 11's factual inquiry requirement. The prefiling investigation must also uncover some basis in law to support the claims in the complaint. A prefiling investigation of the law will not pass muster under Rule 11 where the complaint has "absolutely no chance of success under the existing precedent." *Cleveland Demolition Co.*, 827 F.2d at 988.

■■ After it is determined that Rule 11 has been violated, the amount of sanction is determined. In calculating the sanction, a district court should bear in mind

---

**13.** In this section, we discuss the basic aspects of Rule 11. Other, more complex aspects of Rule 11 will be discussed later in the opinion.

**14.** That an attorney is inexperienced or incompetent would, of course, be relevant where a pleading contains many baseless allegations and the attorney is accused of filing the pleading for an improper purpose. As this circuit recognized in *Kuntsler*, "inexperience or incompetence may have caused their inclusion in a pleading, rather than or in addition to willfulness or deliberate choice." *In re Kuntsler*, 914 F.2d at 519.

Inexperience may also be relevant in determining the amount of the sanction. *Blue v. United States Dept. of the Army*, 914 F.2d 525, 546 (4th Cir.1990) (reaching this conclusion after determining that equitable considerations are relevant to the amount of the sanction), *cert. denied*, — U.S. —, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991).

that the purposes of Rule 11 include "compensating the victims of the rule 11 violation, as well as punishing present litigation abuse, streamlining court dockets and facilitating court management." *In re Kuntsler*, 914 F.2d at 522. The amount of a monetary sanction, however, should always reflect the primary purpose of Rule 11—deterrence of future litigation abuse. *Id.* at 522–23. Accordingly, a district court should expressly consider the four factors adopted by this circuit in *In re Kuntsler*: "(1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the ability to pay; and (4) factors related to the severity of the Rule 11 violation." *Id.* at 523 (citing *White v. General Motors Corp.*, 908 F.2d 675 (10th Cir. 1990)).

■ The district court is in the best position to determine whether sanctions should be imposed and, if so, how much. "Familiar with the issues and litigants, the district court is better situated than the court of appeals to marshall the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Cooter & Gell v. Hartmarx Corp.*, — U.S. —, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990). Further, "[d]eference to the determination of courts on the front lines of litigation will enhance these courts' ability to control the litigants before them …; it will also discourage litigants from pursuing marginal appeals, thus reducing the amount of satellite litigation." *Id.* 110 S.Ct. at 2460. Accordingly, we apply an abuse-of-discretion standard in reviewing all aspects of the district court's Rule 11 determination. *Id.* 110 S.Ct. at 2461; *Stevens v. Lawyers Mut. Liab. Ins. Co. of N.C.*, 789 F.2d 1056, 1060 (4th Cir.1986). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Hartmarx Corp.*, 110 S.Ct. at 2461.

## B. *RULE 11 APPLIED TO THIS CASE*

The approach we must take is to analyze each claim that plaintiffs originally asserted against each defendant insofar as the district court awarded sanctions and evaluate whether the court abused its discretion. We will then evaluate whether the district court abused its discretion in determining the amount of the sanctions.

### 1. Sanctions on the RICO Count
#### a. *Sanctions to McDaniel on the RICO count*

■ We first address whether the district court abused its discretion by awarding sanctions to McDaniel on this count. We assume, as do appellees, that what the district court meant by the language in its award of sanctions to McDaniel was that had plaintiffs applied the facts of their case to the applicable law, plaintiffs would have known that they had no case against McDaniel on this count. Because the district court awarded sanctions based on the filing of the complaint, we must view the complaint in light of the law as it stood on the date plaintiffs filed their complaint.

Prior to plaintiffs' filing their complaint, the latest Supreme Court decision on the RICO pattern requirement was *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In that case, the Court made clear that to state a claim for a violation of section 1962(c) (or, derivatively, of section 1962(d)), a plaintiff was required to allege a pattern of racketeering activity. *Id.* 105 S.Ct. at 3285. The Court did not elaborate in detail on the pattern requirement. It only briefly discussed the pattern requirement in a footnote. In supporting its conclusion that two acts of racketeering activity may not be sufficient to constitute a pattern, the Court quoted language from a Senate report stating that " '[i]t is this factor of *continuity plus relationship* which combines to produce a pattern.' " *Id.* at 3285 n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969)) (emphasis supplied). The Court went on to note that Congress had defined Title X's pattern requirement exclusively in terms of the relationship of the defendant's criminal acts to one another, reciting the language in 18 U.S.C. § 3575(e) that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.*

This circuit in *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149 (4th Cir.1987), elaborated on the Supreme Court's "continuity plus relationship" language. According to the *Zepkin* court, "[t]o spell out this requirement, one might say that the predicate acts must be related and must be part of a continuous criminal endeavor." *Id.* at 154. Concluding that the predicate acts there were related, the panel went on to discuss the continuity factor. The panel rejected a mechanical test, noting that it is proper to focus on the scope of the criminal activity. *Id.* at 155. While a single, limited scheme would be insufficient, a large, continuous scheme would be sufficient to meet the continuity factor. *Id.* This circuit elaborated further on the continuity factor in *HMK Corp. v. Walsey,* 828 F.2d 1071 (4th Cir.1987), *cert. denied,* 484 U.S. 1009, 108 S.Ct. 706, 98 L.Ed.2d 657 (1988). In *HMK,* we found a span of more than four years to be insufficient in the mixed commercial and political context of a zoning decision because administrative processes such as that are generally protracted. *Id.* at 1075. The court went on to state that "[w]e obviously do not intimate that a RICO pattern is impossible in such circumstances. The element of 'continuity' necessary for a pattern of racketeering activity under RICO cannot, however, be viewed in a vacuum and apart from the inherent characteristics of the decisionmaking process." *Id.*

The Supreme Court in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), decided one month after plaintiffs filed their complaint, reiterated that "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* 109 S.Ct. at 2900 (emphasis supplied). Regarding relatedness, the Court cited its discussion in the *Sedima* footnote and concluded that predicate acts are related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)).

The Court also discussed the continuity factor at length, observing:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.

*Id.* at 2902. The Court added that:

> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.... The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases.

*Id.*

The continuity concept was further developed by this circuit in *Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989). In that case, we concluded that a single defendant's acts perpetrated over approximately one year with the limited purpose to defraud two plaintiffs failed to satisfy the continuity requirement. *Id.* at 684.

Appellants argue that on the merits they met the RICO definition of pattern, even as set out by *H.J. Inc.* Appellants allege that the predicate acts were related in that defendants' acts "were all designed to secure participation in city contracts for firms advancing their political and financial objectives." Concerning the continuity prong, appellants maintain that the pattern of

racketeering activity began in 1985 and was still ongoing when appellants filed their complaint in 1989, and that this length of time satisfies the continuity prong. We need not decide whether to reverse the district court's judgment on the merits. This case is an appeal of Rule 11 sanctions, and we need only decide whether appellants' position was objectively reasonable at the time they filed their complaint.

Like the district court, we have been very confused by the allegations in appellants' complaint. We cannot fault the district court for concluding that appellants failed the relatedness prong because the predicate acts alleged to have occurred while Tony Carter was president of RFHC are not related to those alleged to have occurred after Carter left RFHC. With the benefit on appeal of time to wade through appellants' nearly incomprehensible complaint and to reflect, however, we are able to detect that appellants were attempting to allege that the defendants' acts were related in that they "were all designed to secure participation in city contracts for firms advancing [defendants'] political and financial objectives." [15] We need not decide whether such an allegation *satisfies* the relatedness prong. It is for a future court to decide whether the relatedness prong can be satisfied where, although the alleged predicate acts have the same purpose, some of them have seemingly benefitted the plaintiff while others have not. The only binding case prior to the filing of the complaint that discussed the relatedness prong was *Sedima*, and *Sedima* shed no light on the answer to this issue. As such, we cannot conclude that it was objectively unreasonable for appellants to have believed that their allegations concerning relatedness were sufficiently grounded in law that they could properly be filed.

We turn now to the continuity prong. As will be recalled, the district court concluded that the alleged scheme lasted for at most 18 months and that this amount of

time was not substantial, especially given that the activity took place in a mixed commercial and political context. The court cited *HMK*, where this circuit found a span of more than four years to be insufficient in a mixed commercial and political context. Initially, we note that the series of related predicates, as we have interpreted the complaint, are said to have begun in 1985 instead of in 1987. That is, the acts "designed to secure participation in city contracts for firms advancing [defendants'] political and financial objectives" commenced with the formation of RFHC in 1985. Nevertheless, the acts did not extend over a period greater than that in *HMK*, even if we assume that they continued until the complaint was filed in 1989.

Although the district court in its dismissal opinion was concerned with whether the acts extended over a "substantial period of time," this language tracks that in *H.J. Inc.*, which the Supreme Court decided *after* appellants filed their complaint. Whether appellants' complaint stated a claim in light of the "substantial" language is irrelevant to our Rule 11 inquiry. What is relevant, however, is the state of Fourth Circuit precedent when the complaint was filed. The district court relied on *HMK*, 828 F.2d 1071. *HMK* is the Fourth Circuit case most relevant to the continuity issue of the instant case because its general factual setting—a mixed commercial and political context—is similar to that of the instant case. We cannot conclude that *HMK* precluded appellants from arguing that they had satisfied the continuity prong. First, although the case before us also arises in a mixed commercial and political context, the political context is much different. As the court recognized in *HMK*, zoning decisions are complex and compel consideration of numerous and often competing interests and concerns by numerous agencies and organizations. *Id.* at 1075. Further, the process of zoning approval often involves multiple hearings and oppor-

---

**15.** We still do not understand why Brubaker could not have made this simple allegation in his complaint. Fed.R.Civ.P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and Fed. R.Civ.P. 8(e)(1) directs that "[e]ach averment of a pleading shall be simple, concise, and direct." Had Brubaker followed these rules, he could have saved this court much wasted time.

tunity for public comment. *Id.* Certification of an MBE, by contrast, is handled within a single agency—the HRC—and is supposed to involve an objective decision of whether the company has satisfied the city's MBE ordinance. Regarding the actual award of city financing business to certified MBEs, there is nothing in this record to indicate that such decisions involve the same degree of multiple hearings or opportunity for public comment (if there is any such opportunity at all). The financing process does not appear to be as protracted as the zoning process. Under these circumstances, it is not clear that *HMK* barred appellants' complaint. It cannot be said that, when filed, appellants had "absolutely no chance of success under the existing precedent." *Cleveland Demolition Co.*, 827 F.2d at 988.[16] We conclude that the district court abused its discretion by awarding sanctions to McDaniel as a result of the RICO count.

### b. Sanctions to Smith on the RICO count

██ The district court's award of sanctions to Smith on the RICO count differs from the award to McDaniel in that the district court based its award to Smith solely on the lack of a factual basis for alleging "that Smith was involved in a scheme or conspiracy to hinder plaintiffs' efforts to do business as an MBE." Sanctions Order, p. 12. As will be recalled from page 20 above, the alleged scheme was really one "designed to secure participation in city contracts for firms advancing [defendants'] political and financial objectives," and it is the involvement of Smith in this scheme that we must really assess. We must determine whether there is *any* factual basis for this allegation. Only where *no* factual basis exists is Rule 11's factual inquiry requirement violated. *See supra* p. 1374.

██ We conclude that plaintiffs did have a sufficient factual basis under Rule 11 for implicating Smith in the scheme. Many of the facts do not support the alle-

gation that Smith was involved in the scheme. A factual basis for the allegation does exist, however. That factual basis lies in the October 15, 1987, memorandum from Vernon Williams to Claudette McDaniel, with a copy to Alfred Smith, that listed the City's certified MBEs. During his prefiling investigation, Brubaker discovered evidence that this memorandum had been sent to the Tobacco Row Association. This evidence included a memorandum from Lewis to the RFHC Board of Directors stating that Tobacco Row, people had told him that RFHC was not on a list of firms approved for the Tobacco Row project. The evidence also included a letter from Lewis to the managing general partner of Tobacco Row Associates thanking the general partner for bringing the error to his attention and enclosing the letter from HRC to RFHC certifying RFHC as an MBE. From this evidence, it appears reasonable to conclude that the October 15 memorandum was sent to Tobacco Row Associates. In light of Lewis's letter to the managing general partner, it is also reasonable to believe that none of the city officials named in the letter notified the general partner of the omission of RFHC from the memorandum. Because Smith was executive director of the HRC, it is reasonable to assume that he would have been responsible for correcting errors in a list of certified MBEs. While his failure to correct the omission of RFHC may not have been intentional, we conclude that this evidence permitted Brubaker to draw an inference, albeit a weak one, that Smith was involved in a scheme "designed to secure participation in city contracts for firms advancing [defendants'] political and financial objectives." Rule 11 does not require that a judge or jury agree with a plaintiff's allegation. For Rule 11 purposes, the allegation merely must be supported by *some* evidence. Because we are unable to say that plaintiffs had *no* factual basis for their allegation, we cannot conclude that plaintiffs violated Rule 11's factual inquiry requirement. The district

---

**16.** This conclusion is not surprising in light of the Supreme Court's observation in *H.J. Inc.*, 109 S.Ct. at 2902, that the relationship and continuity concepts must be developed in future cases.

**1378**

court abused its discretion by awarding sanctions to Smith as a result of the RICO count.

### c. Sanctions to the City on the RICO count

The district court gave two reasons for awarding sanctions to the City on this count: (1) plaintiffs should have known that the City could not form the criminal intent necessary under RICO; and (2) plaintiffs had no support for alleging that the City was involved in a scheme "to prevent them from obtaining [MBE] certification or securing investment business." Sanctions Order, p. 6.

■ Appellants contend, among other things, that the district court should not have based sanctions on the City's incapacity to form criminal intent because the Fourth Circuit case law in this area was non-existent and there is not enough other authority to conclude that it was objectively unreasonable to believe that the City could form criminal intent. We agree. The district court relied on three district court cases from courts in other circuits as demonstrating that the City was incapable of forming criminal intent.[17] The court could not rely solely on the language in the RICO statute itself because that statute contains language broad enough to include municipal corporations. As stated in one of the cases that the district court cited, "The term 'person' as defined by the RICO statute at 18 U.S.C. § 1961(3) is literally broad enough to include municipal corporations." *In re Citisource, Inc. Securities Litigation,* 694 F.Supp. 1069, 1079 (S.D.N.Y.1988). Where neither the Supreme Court nor any courts within this circuit have ruled on the issue and the statute itself does not offer a clear answer, the issue is not one on which a plaintiff has "absolutely no chance of success." *Cleveland Demolition Co.,* 827 F.2d at 988. A plaintiff under such circumstances has a right to come to court seeking to obtain a different result from that reached by other districts. He need not advance a winning argument to avoid Rule 11 sanctions. Any other conclusion would chill an attorney's enthusiasm or creativity in pursuing legal theories, a result that the advisory committee sought to avoid. Fed.R.Civ.P. 11, advisory committee notes on 1983 amendment.

■ The district court's second justification for awarding sanctions to the City was that "plaintiffs had no evidence to support their allegations that the City was involved in a scheme to prevent them from obtaining [MBE] certification or securing investment business." Sanctions Order, p. 6. Before assessing the district court's conclusion, we must necessarily determine on what basis the City itself might be involved for RICO purposes. This answer will allow us to assess plaintiffs' evidence. A reading of plaintiffs' memorandum in opposition to the City's motion to dismiss indicates that plaintiffs appear to have believed they could hold the City liable because of agency law. Under general agency law, principals are liable for the acts of their agents when those agents act within the scope of their actual or apparent authority. *See American Soc. of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.* 456 U.S. 556, 565–70, 102 S.Ct. 1935, 1942–44, 72 L.Ed.2d 330 (1982).[18] Neither the RICO statute itself nor controlling precedent foreclosed this respondeat superior theory

---

**17.** *See supra* note 6.

**18.** "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Hydrolevel Corp.,* 456 U.S. at 566 n. 5, 102 S.Ct. at 1942 n. 5 (citation omitted). Under the apparent authority concept, the employer need not derive any benefit from the agent's fraud. *Id.* at 567–68, 102 S.Ct. at 1943.

We note that plaintiffs' memorandum in opposition to the City's motion to dismiss seems to have relied more on the agency concept of ratification than that of apparent authority; among other things, the memorandum claims that the mayor and members of the city council "knew that something was wrong, but took no action." R2–35–15. Because a complaint merely must have *some* chance of success under existing precedent, *see supra* p. 1374 and it would have been factually easier for plaintiffs to have prevailed on an apparent authority theory, we address the latter theory.

at the time plaintiffs filed suit. Further, the district courts and other circuit courts that had discussed the concept of vicarious liability in the RICO context had reached differing results. *Compare Tryco Trucking Co. v. Belk Stores Servs., Inc.,* 634 F.Supp. 1327, 1334–35 (W.D.N.C.1986) (finding that "RICO envisions *respondeat superior* liability"), *Morley v. Cohen,* 610 F.Supp. 798, 811 (D.Md.1985) (concluding that "a corporation or partnership can be held liable under RICO for the acts of its agents and/or representatives committed within the scope of their authority") and *Bernstein v. IDT Corp.,* 582 F.Supp. 1079, 1083 (D.Del.1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent."), with *D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964, 968 (7th Cir.) ("rejecting the doctrine of *respondeat superior* in civil RICO cases), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), *Continental Data Sys. v. Exxon Corp.,* 638 F.Supp. 432, 440 (E.D.Pa.1986) ("I believe ... that the application of ordinary agency principles runs counter to the intended structure and operation of RICO civil liability.") and *Dakis v. Chapman,* 574 F.Supp. 757, 759–60 (N.D.Cal.1983) (refusing to allow *respondeat superior* RICO liability for securities law violations by lower level corporate executive).

To determine whether plaintiffs had any evidence that the City was involved in a scheme, then, we must ascertain whether plaintiffs had a sufficient factual basis for implicating any City employees (who were acting within the scope of their actual or apparent authority) in the scheme. Our discussion concerning Alfred Smith in section IV(B)(1)(b) above disposes of this matter. As the executive director of the HRC, Alfred Smith clearly was the City's agent. His actions regarding MBE certification, and especially his action with regard to the October, 1987, memorandum, were at least within the scope of his apparent authority. Because we have found that the October, 1987, memorandum gave plaintiffs a suffi-

cient basis for Rule 11 purposes to implicate Smith in the scheme, we find that plaintiffs also had a sufficient factual basis under Rule 11 for implicating the City in the scheme. The district court abused its discretion in concluding that there was no evidence to support plaintiffs' implication of the City.

2. Sanctions on the Section 1983 Count
 *a. Sanctions to the City on the section 1983 count*

■■■ The district court awarded sanctions to the City on this count because plaintiffs proffered only a single conclusory allegation of policy or custom that was without factual support and was contradicted by other allegations in the complaint. Whether plaintiffs' complaint makes only a conclusory allegation of municipal custom or policy is irrelevant to our Rule 11 inquiry. *See Simpson,* 900 F.2d at 36. The factual support for the allegation is relevant, however. Because the concept of a municipal policy or custom is a legal one, we must assess the factual support in light of the legal standards.

Contrary to the earlier discussion of the situation obtaining vis-a-vis the RICO count, it is clear that when plaintiffs filed their complaint a plaintiff could not establish municipal liability under section 1983 solely on a *respondeat superior* theory. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Milligan v. City of Newport News,* 743 F.2d 227, 229 (4th Cir. 1984). A plaintiff must show that the execution of a municipal custom or policy inflicts the injury. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037, *Hughes v. Halifax County School Bd.,* 855 F.2d 183, 185 (4th Cir. 1988), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989). A custom would exist where there are " 'persistent and widespread ... practices of [municipal] officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.' " *Spell v. McDaniel,* 824 F.2d 1380, 1386 (4th Cir.1987) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036), *cert. denied,* 484 U.S.

1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). A municipal policy would exist where a city's lawmakers have passed a law, *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, or where a city official takes certain action and is the decisionmaker responsible for establishing final government policy respecting such activity. *Hughes*, 855 F.2d at 185. This latter concept of policy may subject a municipality to liability for even a single decision by a municipal policymaker. *Morrash v. Strobel*, 842 F.2d 64, 67 (4th Cir.1987).

Plaintiffs did not rely on a Richmond ordinance itself as establishing an unconstitutional policy. According to the ordinance at issue:

> *Minority business enterprise* means a business at least fiftyone (51) percent of which is owned and controlled or fiftyone (51) percent minority-owned and operated by minority group members or, in case of a stock corporation, at least fifty-one (51) percent of the stock which is owned and controlled by minority group members.

Richmond, Va., City Code § 12–23, p. 941 (1985) (emphasis supplied).[19] Plaintiffs alleged in their complaint that they were denied due process not because of the ordinance itself, but because the defendants added another factor not listed in the ordinance, that being day to day control of the company by minorities. Plaintiffs' Complaint, ¶ 282(a). Plaintiffs also added that "[t]he treatment accorded the plaintiffs in their pursuit of MBE certification and business was so fundamentally at odds with the purpose and intent of the City ordinance and regulations as to be a substantive due process violation." Plaintiffs' Complaint, ¶ 282(d). These statements indicate that plaintiffs had to have relied on other methods of showing a municipal policy or custom than alleging that the ordinance itself was unconstitutional.

One such method would be to show that " 'persistent and widespread ... practices of [municipal] officials" caused the constitutional deprivation. Here, however, prior to filing their complaint plaintiffs had no evidence of such practices. In fact, plain-

tiffs alleged in their complaint that defendants had "created a certification process for them which no other MBE firms had to go through." Plaintiffs' Complaint, ¶ 266. On appeal, plaintiffs maintain that the months of protracted discussion between the City's employees and plaintiffs concerning RFHC's MBE status is sufficient to satisfy the "persistent and widespread practices" requirement. This post hoc rationalization must fail. It is clear that this contact between the City's employees and plaintiffs constituted a single instance of alleged unconstitutional activity. Plaintiffs would have been required to show that other MBE firms were judged according to the same practice. They admitted in their complaint that such was not the case.

Plaintiffs could have alleged a city policy by alleging that a city official took certain action and was the decisionmaker responsible for establishing final government policy respecting such activity. On appeal, plaintiffs maintain that "Smith had the final power to issue the unreviewable race-specific edicts denying plaintiffs MBE certification." Appellants' Opening Brief at 37–38. Plaintiffs, however, offer nothing to show that Brubaker's prefiling factual investigation uncovered any information showing that Smith was responsible for final government policy respecting MBE certification; nor did plaintiffs allege in their complaint that Smith was so responsible. Under these circumstances, the district court did not abuse its discretion in awarding sanctions to the City because plaintiffs' allegation of policy or custom was without factual support.

#### b. Sanctions to McDaniel on the section 1983 count

The district court awarded sanctions to McDaniel on this count because plaintiffs continued to pursue this claim for a period of months despite "having gathered no evidence that she [McDaniel] was even involved in the decision-making process which they claimed deprived them of constitutional rights." Sanctions Order, p. 10. The court awarded McDaniel reasonable expenses incurred, including attorneys'

---

**19.** For the definition of "minority group members," see note 1 above.

fees, from August 7, 1989, forward.[20] August 7 was the first day that McDaniel's attorneys billed her for reviewing plaintiffs' memorandum in opposition to McDaniel's Motion to Dismiss. Appellants expend the majority of their effort arguing that sanctions were inappropriate prior to the completion of defendants' depositions on October 19, 1989. Although appellants' contention is largely based on the objective reasonableness of their position prior to that point, we need not delve into this question because of our view of the activity for which Rule 11 requires sanctions.

■■■ We first note that the district court erred in awarding attorneys' fees from August 7 because on August 24 the district court denied McDaniel's motion to dismiss the section 1983 count, finding that the section 1983 charge against McDaniel was at that time supported by sufficient allegations. R5–101–12.[21] The question then arises whether the district court could properly award sanctions for activity occurring between the August 24 denial of McDaniel's motion to dismiss and the November 21, 1989, grant of McDaniel's motion for summary judgment. The answer depends in part on whether Rule 11 imposes on parties and counsel a duty continu-

ously to reevaluate the merits of their case as the litigation develops and to dismiss the case once it appears that the case no longer has a factual or legal basis.

This circuit has indicated in *Simpson v. Welch*, 900 F.2d 33 (4th Cir.1990), that Rule 11 does not impose such a duty. In *Simpson*, the district court had awarded sanctions in part because of counsel's failure to oppose motions to dismiss and for summary judgment and because of counsel's "blatant disregard" for the local rules and "lackadaisical attitude in failing to respond to defendants' Motion for Award of Attorneys' Fees." *Id.* at 36. The court of appeals vacated the award, stating that Rule 11 "does not purport to be a means for district courts to sanction conduct in the course of a lawsuit ... that does not involve the signing of pleadings, motions, or other papers." *Id.*[22] The court added that "Rule 11, by its own terms, can never be the basis for sanctions for *failure* to file certain papers." *Id.* at 36–37 (emphasis supplied). Were we to find that plaintiffs here had a continuing obligation to reevaluate the merits of their case and to dismiss the case once it lacked merit, we would be concluding—contrary to *Simpson*—that Rule 11 *can* be "the basis for sanctions for *failure* to file certain papers."[23] We can-

---

**20.** We note that plaintiffs' appellate counsel states that the district court awarded McDaniel attorneys' fees incurred after September 14, 1989. While this statement is true, counsel fails to observe that the court also awarded attorneys' fees incurred prior to September 14. Had appellate counsel read the district court's sanctions opinion with a reasonable degree of care, counsel would have discovered that the district court awarded attorneys' fees beginning with McDaniel's attorneys' September 14, 1989, statement of fees and expenses. A quick review of this statement reveals that it includes attorneys' fees dating back to August 7, 1989.

**21.** In its sanctions opinion, the district court also found that the claim was not frivolous when filed. Sanctions Order, p. 10.

**22.** This language is similar to that used in *Introcaso v. Cunningham*, 857 F.2d 965 (4th Cir. 1988), where this circuit reviewed a district court's decision to impose sanctions for frivolous postverdict litigation. The district court had imposed sanctions for all frivolous postverdict litigation. *Id.* at 969 & n. 6. We concluded that such a Rule 11 finding was "impermissibly broad." *Id.* at 969–70. We observed that "Rule

11 does not authorize the imposition of sanctions for all actions taken in the course of litigation. It authorizes sanctions stemming from the signing of a pleading, motion or other paper.... The district court's finding is so general that it may include some postverdict proceedings which did not result from the signing of a document as proscribed by Rule 11." *Id.* at 970.

**23.** We do not believe that *Fahrenz v. Meadow Farm Partnership*, 850 F.2d 207 (4th Cir.1988), is contrary to *Simpson*. In that case, the district court imposed sanctions because it found that plaintiff's claims were not well grounded in fact after certain depositions had taken place. *Meadow Ltd. Partnership v. Heritage Sav. & Loan Assoc.*, 118 F.R.D. 432, 434 (E.D.Va.1987). The court specifically disapproved of plaintiff's filing of a brief in opposition to defendants' motion for summary judgment. *Id.* The district court awarded defendants a portion of their expenses incurred during the time following the depositions until the case was dismissed. *Id.* Although the court of appeals affirmed the award of sanctions, it does not appear that plaintiff and counsel asked the court to review

not overrule a prior panel of this circuit. *Derflinger v. Ford Motor Co.*, 866 F.2d 107, 110 (4th Cir.1989). Moreover, we believe that the "snapshot" view of Rule 11 is the proper view.[24]

■ The "snapshot" view of Rule 11 is supported by the plain language of Rule 11 and the advisory committee's notes. We agree with the Second Circuit's reasoning in *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987):

> Entitled "Signing of Pleadings, Motions, and Other Papers; Sanctions", the rule refers repeatedly to the signing of papers; its central feature is the certification established by the signature.
>
> In addition, when rule 11 was amended in 1983 to make sanctions mandatory, the rule was also amended to include the words "motion or other paper" each time after the word "pleading" was used. Thus, amended rule 11 applies to every paper signed during the course of the proceedings and not only to the pleadings. While the drafters of the rule could easily have further extended its application by referring to the entire conduct of the proceedings, they failed to do so and instead chose to expand only the categories of papers to which the rule applies.
>
> Moreover, the advisory committee note to the amended rule states that the sig-

ner's conduct is to be judged as of the time the pleading or other paper is signed. Fed.R.Civ.P. 11 advisory committee note. It is difficult to imagine why this comment would be made if the rule were meant to impose a continuing obligation on the attorney.

*See also, e.g., Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1200–01 (7th Cir.1990) (quoting extensively from *Oliveri* and agreeing that "Rule 11 does not impose a continuing obligation upon attorneys"); *Corporation of the Presiding Bishop v. Associated Contractors, Inc.*, 877 F.2d 938, 942–43 (11th Cir.1989) (finding no continuing obligation to amend complaint if complaint was reasonably interposed in first place), *cert. denied*, —— U.S. ——, 110 S.Ct. 1133, 107 L.Ed.2d 1038 (1990); *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 874–75 (5th Cir.1988) (en banc) (concluding that "[l]ike a snapshot, Rule 11 review focuses upon the instant when the picture is taken—when the signature is placed on the document"); *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484 (3rd Cir.1987) (determining that "Rule 11 does not authorize a sanction for failing to amend or correct a document if information obtained or legal research performed after filing reveals an error"); *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir.1989) (concluding that "Rule 11 does not impose a continuing obligation").[25]

---

the time frame for which defendants had been awarded expenses. In their cross-appeal, plaintiff and counsel "urge[d] this court to overturn the district court's order imposing the sanction." 850 F.2d at 209. This circuit's decision thus focused on whether sanctions were appropriate at all. The court concluded that "[p]laintiff's counsel acted unreasonably in filing a brief in opposition to summary judgment once" the case became objectively frivolous. *Id.* at 210. Because the court was not confronted with an appeal of the period for which expenses were awarded, we cannot say that the court was attempting to impose a continuing obligation on parties and counsel to file dismissal papers once a case is no longer well grounded in fact or in law.

**24.** It should be remembered that the "snapshot" view does not obviate the need to reevaluate one's case. Many papers are signed and filed during the course of the proceedings, and coun-

sel must ensure that each paper filed has merit in order to avoid sanctions. A paper signed and filed in opposition to a motion for summary judgment when development of the facts has made it clear that summary judgment must be granted, for example, will violate Rule 11.

**25.** We note that we are not confronted with an award of sanctions based on a court's inherent power to govern and regulate the conduct of litigation before it or on 28 U.S.C. § 1927 (1988). The inherent power of the court would permit an award of attorneys' fees where an opposing party exercises bad faith in the conduct of litigation. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980). 28 U.S.C. § 1927 also imposes a continuing obligation in the conduct of litigation. Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy person-

■ Having concluded that Rule 11 properly applies to the act of signing papers, we next must assess whether, between the denial of the motion to dismiss and the grant of McDaniel's summary judgment motion, plaintiffs filed any papers in opposition to McDaniel that would be subject to Rule 11.[26] Plaintiffs cannot be sanctioned for actions prior to their November 3, 1989, Memorandum in Opposition to Claudette McDaniel's Motion for Summary Judgment because this document is the first paper concerning the claims against McDaniel that plaintiffs filed subsequent to the denial of the motion to dismiss. We must determine whether filing this memorandum was objectively frivolous.

After filing the complaint in May, 1989, Brubaker allegedly had conversations with FBI agents, a United States Attorney, and a state police investigator. The state police investigator allegedly told Brubaker that, although he could not tell Brubaker about his investigation, Carter's admissions would substantiate plaintiffs' factual claims. Carter's deposition did not provide factual support; nor did McDaniel's. Prior to taking defendants' depositions, plaintiffs' strongest evidence that McDaniel was involved in the decision making process was that McDaniel was chairman of the city council's liaison committee with the Human Relations Commission and that McDaniel's name appeared on the October 15, 1987, memorandum listing certified MBE firms. After taking defendants' depositions and having had the opportunity for other discovery, plaintiffs were able to produce no evidence indicating that McDaniel's position on the liaison committee caused her to be involved in the MBE certification process. In fact, McDaniel's sworn deposition testimony contradicted such an allegation.[27] Regarding the October, 1987, memorandum, plaintiffs discovered no evidence indicating that McDaniel even knew that RFHC had been certified the previous month.[28] Under these circumstances, it is not an abuse of discretion to find that when plaintiffs filed their memorandum opposing summary judgment, they had no factual support for their allegation that McDaniel was involved in the decision making process they claimed deprived them of their constitutional rights. The district court properly could hold plaintiffs and their attorney responsible for McDaniel's reasonable expenses incurred because of the filing of this memorandum in opposition to summary judgment.[29]

### 3. Sanctions on the Defamation Count

■ As will be recalled, the district court awarded Rule 11 sanctions to the City, McDaniel, and Williams because a reasonable inquiry into Virginia limitations law would have demonstrated that any defamation claims involving the October, 1987,

---

ally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Like an award under the court's inherent power, section 1927 also requires a finding of counsel's bad faith as a precondition to the imposition of fees. *See Blair v. Shenandoah Women's Center, Inc.*, 757 F.2d 1435, 1438 (4th Cir.1985). *See also, e.g., Baker Indus. v. Cerberus Ltd.*, 764 F.2d 204, 208–09 (3rd Cir.1985). Despite these two bases for awarding sanctions, McDaniel moved for sanctions pursuant only to Rule 11, and the district court based its award of sanctions on only Rule 11. The court made no specific finding of bad faith on the section 1983 issue. Under these circumstances, we will not speculate on whether sanctions would have been appropriate under either the court's inherent power or under section 1927.

26. We note that discovery papers are not governed by Rule 11, but instead are governed by Fed.R.Civ.P. 26(g) (imposing certification requirement for discovery requests, responses, and objections). Fed.R.Civ.P. 11, notes of advisory committee on 1983 amendment. Discovery motions, however, are regulated by Rule 11. *Id.*

27. Smith also stated in his deposition that he had not discussed RFHC with McDaniel at any time. R4–70 (Smith deposition p. 47 included as an exhibit).

28. One of plaintiffs' own stockholders even testified in his deposition that, other than McDaniel's name being on the memorandum, he had no knowledge that she knew the list was made or that she had seen the memorandum. R3–65 (Skaltsounis deposition pp. 37, 39 included as an exhibit).

29. We note that these expenses did not begin prior to November 5, 1989, the day McDaniel's attorney received plaintiffs' memorandum opposing summary judgment. R11–117.

memorandum from Williams to Smith were clearly time-barred.[30] The court also awarded sanctions to the City based on the claim concerning Smith's statements to the newspaper because it found that plaintiffs should have known that the City had not directed, authorized, or ratified the statements and thus could not be liable for the statements. Plaintiffs have not contested this latter ruling, and we thus will not address it.

Plaintiffs' principal argument concerning the October, 1987, memorandum is that sanctions are inappropriate because a defendant must affirmatively plead the statute of limitations as a defense, and Brubaker dropped the claim as soon as the limitations defense was raised. We note initially that our review of the record indicates that Brubaker did *not* drop the claim as soon as the limitations defense was raised. McDaniel, in her motion to dismiss, contended that the limitations period is one year and cited Va.Code Ann. § 8.01–248 and *Morrissey v. William Morrow & Co.*, 739 F.2d 962 (4th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 340 (1985).[31] R2–32–20. Despite McDaniel's having pointed out the law to Brubaker, the latter continued to pursue the defamation claim in his memorandum in opposition to McDaniel's motion to dismiss. Although opposing McDaniel's motion to dismiss the defamation count, Brubaker's memorandum did not even discuss the statute of limitations. R2–36–14. Further, Brubaker did not drop the claim immediately after counsel for McDaniel raised the

limitations issue at the August 24, 1989, hearing on the motions to dismiss. Despite McDaniel's counsel's statement regarding the statute of limitations, R6–25, Brubaker still argued to the court "that the circumstances that we have pled are sufficient for us to continue on in this case with each of the counts; that we have met our burden of showing the circumstances and facts, and that the 12(b)(6) motion should be denied in total." R6–43. It was not until the district judge later questioned Brubaker specifically about the defamation count that Brubaker conceded that the statute of limitations is one year on a defamation count. R6–44.

Although plaintiffs' characterization of the facts is inaccurate, this inaccuracy has not affected our view of this issue. Even had Brubaker dropped the claim as soon as the limitations argument was raised, we would still conclude that a plaintiff cannot avoid Rule 11 sanctions merely because a defense to the claim is an affirmative one. A pleading requirement for an answer is irrelevant to whether a complaint is well grounded in law. Were we to follow plaintiffs' suggestion, we would be permitting future plaintiffs to engage in the kind of "cat and mouse" game that Brubaker engaged in here: alleging a time-barred claim to see whether the defendants would catch this defense, continuing to pursue the claim after a defendant pointed out that it was timebarred, urging the court not to dismiss the claim, and finally conceding without argument to the contrary that the claim was time-barred.[32]

---

**30.** For some reason, the district court did not award sanctions to Smith based on the time-barred memorandum. Because Smith has not crossappealed, we do not decide whether he too was entitled to sanctions on this count.

**31.** Va.Code Ann. § 8.01–248 (1984) provides: "Every personal action, for which no limitation is otherwise prescribed, shall be brought within one year after the right to bring such action has accrued."

The Fourth Circuit in *Morrissey* concluded: "The Virginia Supreme Court has consistently applied the one year statute of limitations in Va.Code 8.01248 to defamation actions." 739 F.2d at 967. A minimal investigation into Fourth Circuit precedent by Brubaker would

also have revealed *Semida v. Rice*, 863 F.2d 1156, 1160 (4th Cir.1988), a decision quoting *Morrissey's* language.

**32.** We note that we can see no logical reason why the "cat and mouse game" would not be extended beyond situations concerning affirmative defenses. A future plaintiff could raise any claim invalid according to existing precedent, hoping that the defendant would be careless and not find that precedent. In a hearing for Rule 11 sanctions, the plaintiff could then claim that it was up to the defendant to argue that the precedent barred the plaintiff's claim. Were we to accept plaintiffs' theory in our case, that future plaintiff would successfully avoid Rule 11 sanctions. Such a result would effectively abolish Rule 11.

Plaintiffs would have us proceed under a theory where because of the ignorance of one's adversary, one could advance a claim groundless in law. Rule 11 does not concern itself with the failure to assert an available defense. Rule 11 does not permit a plaintiff to avoid sanctions merely because the opposing party or the judge might not immediately recognize that the assertion is groundless. Where an attorney knows that a claim is time-barred and has no intention of seeking reversal of existing precedent, as here,[33] he makes a claim groundless in law and is subject to Rule 11 sanctions.

> 4. Sanctions on the Virginia Conspiracy Act Count
>
> *a. Sanctions to the City on the Virginia Conspiracy Act count*

The district judge awarded sanctions to the City on this count for two reasons: (1) plaintiffs should have known that the City was incapable of forming the criminal intent necessary for liability under the Virginia Conspiracy Act;[34] and (2) "plaintiffs had no evidence to support their allegations that the City was involved in a scheme to prevent them from obtaining [MBE] certification or securing investment business." Sanctions Order, p. 6.

 Our analysis of the first reason given by the district court parallels our discussion concerning the RICO count in section IV(B)(1)(c) above. As will be recalled, we must determine whether plaintiffs had "absolutely no chance of success." *Cleveland Demolition Co.,* 827 F.2d at 988. To make this determination, we must look to the statute itself and to cases providing controlling precedent. The Virginia Conspiracy Act itself does not clearly state

whether cities can be subjected to liability. Va.Code Ann. § 18.2–499 refers to "persons who shall combine ...,"[35] and Va. Code Ann. § 1–13.19 (Supp.1990) states that "'person' shall include any individual, corporation, partnership, association, company, business, trust, joint venture or other legal entity."[36] The Virginia Supreme Court has not been confronted directly with whether a City is a person within the meaning of the Virginia Conspiracy Act. We have found no courts within this circuit that have confronted this question, either. As plaintiffs argued to the district court in opposing the City's motion to dismiss, though, the Virginia Supreme Court has interpreted the predecessor of section 113.19 as including cities within the meaning of "person." *See Commonwealth v. Schmelz,* 116 Va. 62, 81 S.E. 45, 47 (1914) (permitting city to maintain an appeal where the operative statute provided that "[a]ny person who thinks himself aggrieved ... may present a petition ... for a writ of error"); *Portsmouth Gas Co. v. Sanford,* 97 Va. 124, 33 S.E. 516, 516–17 (1899) (finding that city was subject to garnishment statute stating that "any person" indebted to or having in his hands effects of the defendant could be summoned as a garnishee). *See also Hanbury v. Commonwealth,* 203 Va. 182, 122 S.E.2d 911, 914 (1961) (finding that the city was a "person" whose rights could be prejudiced under statute providing for punishment of any person who forged a writing "to the prejudice of another's right"). Further, a recent pronouncement of the supreme court in a Virginia Conspiracy Act case seems to have left open the possibility that a city can be sued under that Act. In *Fox v. Deese,* 234 Va. 412, 362 S.E.2d 699 (1987), the supreme court confronted a situ-

---

**33.** We note that in their Reply Brief, plaintiffs make a belated argument that the statute of limitations on defamation actions was not well-settled. There is no indication, however, that while pursuing the defamation claim Brubaker ever believed that the limitations period was other than well-settled. As appellate counsel admitted at oral argument, Brubaker never asserted that the law was not well-settled. Brubaker never contended that the existing Fourth Circuit precedent should be reversed, either.

**34.** The court cited the three district court cases referred to in note 6 above.

**35.** For the relevant text of this statute, see note 5 above.

**36.** Prior to 1988, section 1–13.19 stated that the word "'person' may extend and be applied to bodies politic and corporate as well as individuals."

ation where a plaintiff sued three City of Richmond employees under the Virginia Conspiracy Act. The court stated that if "the defendants were acting within the scope of their employment ... then only one entity exists—the City." *Id.* 362 S.E.2d at 708. The court went on to state that "[b]y definition, a single entity cannot conspire with itself." *Id.* It could be argued, although by no means definitively, that this statement means that the City can conspire with a non-city entity for purposes of the Virginia Conspiracy Act. Under these circumstances, we are not able to say that plaintiffs had "absolutely no chance of success" in bringing a Virginia Conspiracy Act claim against the City. We conclude that the district court abused its discretion by sanctioning plaintiffs on the basis of three district court cases from outside this circuit interpreting RICO.

 We now address the district court's second reason for imposing sanctions on the Virginia Conspiracy Act count. Again, our analysis parallels that of the RICO count. We first look at the basis on which the City itself might be involved for Virginia Conspiracy Act purposes—agency law. Virginia agency law does not differ from general agency law; principals are liable for the acts of their agents when those agents act within the scope of their actual or apparent authority, and an employer need not derive any benefit from an employee's fraud. *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 596 (1984). *See also, e.g., Kern v. Barksdale,* 224 Va. 682, 299 S.E.2d 365 (1983) (discussing apparent authority); *Neff Trailer Sales, Inc. v. Dellinger,* 221 Va. 367, 269 S.E.2d 386, 388 (1980) (same). When plaintiffs filed their complaint, the Virginia Supreme Court had not rejected the concept of vicarious liability in the Virginia Conspiracy Act context and, in fact, seemed to leave open at least the possibility of this theory. *See Fox,* 362 S.E.2d at 708. Because we found in our RICO discussion that plaintiffs had a sufficient factual basis for implicating the City in the scheme (see pages 1378–79 above), we necessarily reach the same conclusion here.

In sum, the district court abused its discretion in awarding sanctions to the City on the Virginia Conspiracy Act count.

### b. Sanctions to McDaniel on the Virginia Conspiracy Act count

 The district court awarded sanctions to McDaniel on this count because, although not frivolous when filed, plaintiffs continued to pursue the claim for a period of months despite having gathered no evidence that she was involved in a conspiracy to injure them. As on the section 1983 count, which the district judge also found not frivolous when filed, the district judge awarded McDaniel reasonable expenses incurred, including attorneys' fees, dating from August 7, 1989.

Having concluded that plaintiffs can only be sanctioned for and from the filing of their November 3, 1989, Memorandum in Opposition to Claudette McDaniel's Motion for Summary Judgment (see section IV(B)(2)(b)), we must assess whether the filing of this memorandum was objectively frivolous. Our discussion regarding the section 1983 count is dispositive. The same facts that plaintiffs alleged gave rise to both the section 1983 and conspiracy counts, and McDaniel would not have been involved in a conspiracy if she was not involved in the decision making process that allegedly deprived plaintiffs of their constitutional rights. Our conclusion that it was not an abuse of discretion to find that plaintiffs had no factual support for implicating McDaniel in the decision making process (see page 1383 above) necessitates a similar conclusion regarding her involvement in a conspiracy.

In sum, it is not an abuse of discretion to find that plaintiffs violated Rule 11 by filing their November 3 memorandum.

### c. Sanctions to Smith on the Virginia Conspiracy Act count

 The district court awarded sanctions to Smith on the Virginia Conspiracy Act count for the same reason it awarded sanctions to him on the RICO count: plain-

tiffs lacked a factual basis for alleging "that Smith was involved in a scheme or conspiracy to hinder plaintiffs' efforts to do business as an MBE." Sanctions Order, p. 12. Because the lack of a factual basis for alleging Smith's involvement is the basis for the sanctions on both counts, our analysis in section IV(B)(1)(b) above is dispositive. We conclude that the district court abused its discretion by sanctioning plaintiffs for bringing the Virginia Conspiracy Act claim against Smith.

5. Determining the Amount of the Sanction

■ Last, plaintiffs and their trial counsel take issue with the district court's determination of the amount of the sanction. At the outset, we note that the City, McDaniel, and Williams concede in their brief that the district court should not have awarded expenses incurred in connection with their motions for sanctions.[37] As this circuit stated in *Blue v. United States Dept. of the Army*, 914 F.2d 525, 548 (4th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991), "[l]itigants should be able to defend themselves from the imposition of sanctions without incurring additional sanctions." Where a filing concerning an opposing party's motion for sanctions does not itself violate Rule 11, as here, it is an abuse of discretion for a district court to award expenses incurred in connection with the sanctions motion. *See id.* at 548–49. *See also Introcaso v. Cunningham*, 857 F.2d 965, 970 (4th Cir.1988) (finding that the amount of sanction could not include "litigation activity and associated expenses for defendant's motion for attorney's fees under ... Rule 11"). Accordingly, we reverse the award of expenses associated with defendants' Rule 11 motions.

The chief contention of plaintiffs and their trial counsel is that the district court failed to consider adequately the four factors for determining an appropriate sanction. As will be recalled, the district court must expressly consider the following four factors: "(1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the ability to pay; and (4) factors related to the severity of the Rule 11 violation." *In re Kuntsler*, 914 F.2d at 523.

■ Although plaintiffs and their trial counsel argue that the district court erred by not explaining in detail why defendants' attorneys' fees were reasonable, we hold that the district court did not abuse its discretion in determining the reasonableness of defendants' attorneys' fees. The district court stated whether the attorneys' fees of each defendant were reasonable, and even found a portion of the City's attorneys' fees to be unreasonable, Sanctions Order, p. 8 n. 2. Rule 11 permits the district court to award a reasonable attorney's fee, and the court need not do more in its order than state whether the fee is reasonable. Such a statement indicates that the court has undertaken an analysis of the reasonableness of the fee.[38]

The trial court did not consider the minimum amount of sanctions reasonably necessary to deter, and on remand the court should do so. The court should keep in mind that "the primary purpose of sanctions is to deter attorney and litigant misconduct, not to compensate the opposing party for its costs in defending a frivolous suit. It is particularly inappropriate to use sanctions as a means of driving certain attorneys out of practice." *In re Kuntsler*, 914 F.2d at 524 (citation omitted).

The trial court also did not expressly consider plaintiffs and their trial counsel's ability to pay. Although the burden is on

---

37. Although the City states in its brief that it was compensated for 11.75 hours spent in connection with its motion for sanctions, our review of Beverly Burton's time record in the City's memorandum in support of its sanctions motion indicates that she spent at least 12.2 hours on the motion for sanctions. R10–103.

38. We note that counsel for the City, McDaniel, Smith, and Williams included affidavits of time expended and their hourly rates for services in their sanctions memoranda. In their memoranda in response to the sanctions motions, plaintiffs and their trial counsel did not even suggest to the district court that either the time expended or the hourly rates were unreasonable.

the sanctioned parties to offer evidence of their financial status, a monetary sanction imposed without any consideration of ability to pay is an abuse of discretion. *Id.* On remand, the court should consider this factor. If the court on remand is contemplating a large monetary sanction, the court should give those to be sanctioned the opportunity to submit affidavits on their financial status, or to submit such other evidence as the court in its discretion deems appropriate. *Id.* The evidence offered should enable the district court to determine what amount of sanction would be so great as to restrict unfairly plaintiffs' access to the courts, to cause plaintiffs' or Brubaker great financial distress, or to curtail Brubaker's ability to practice law. *See id.*[39]

We also remind the district court that on remand it should consider factors related to the severity of the Rule 11 violation, such as "the offending party's history, experience, and ability, the severity of the violation, the degree to which malice or bad faith contributed to the violation, the risk of chilling the type of litigation involved, and other factors as deemed appropriate." *Id.*

## V. THE ENDING

Having wound our way through the twists and turns created by plaintiffs' yarn, we finally reach the end. Before we conclude, we summarize the results we have reached. The judgment awarding sanctions to United Daniels is VACATED. The sanctions awarded to the City, McDaniel, and Smith as a result of Count I, the RICO claim, are REVERSED. The imposition of sanctions to the City as a result of Count II, the section 1983 claim, is AFFIRMED. The imposition of sanctions to McDaniel as a result of Count II is AFFIRMED IN PART AND REVERSED IN PART. The determination to award sanctions to the City, McDaniel, and Williams because of Count III, the libel, slander, and defamation claim, is AFFIRMED. The sanc-

tions awarded to the City and Smith as a result of Count IV, the Virginia Conspiracy Act claim, are REVERSED. The decision to award sanctions to McDaniel because of Count IV is AFFIRMED IN PART AND REVERSED IN PART. On REMAND, the district court should consider the amount of sanction to impose in accordance with section IV(B)(5) of this opinion.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

---

**39.** We note that even if plaintiffs and their trial counsel should prove to be totally impecunious, the court may impose modest sanctions to deter future baseless filings. *White,* 908 F.2d at 685.